[No. 60011-2. En Banc. March 17, 1994.]

WASTE MANAGEMENT OF SEATTLE, INC., ET AL, *Respondents*, v. THE UTILITIES AND TRANSPORTATION COMMISSION, *Appellant*.

*Christine O. Gregoire, Attorney General*, and *Robert D. Cedarbaum, Assistant*, for appellant.

*Davis Wright Tremaine*, by *Stephen M. Rummage, Craig Gannett*, and *William K. Rasmussen*, for respondents.

[As amended by order of the Supreme Court May 5, 1994.]

BRACHTENBACH, J. — At issue is the interpretation and application of two statutes. The first is RCW 81.77.160, a disposal fee pass-through provision which instructs the Washington Utilities and Transportation Commission (WUTC) to pass through to ratepayers disposal charges incurred at a facility which a solid waste collection company is required to use under a local comprehensive solid waste management plan or local ordinance designating disposal sites. The second is the interpretation and application of RCW 81.16.030, the affiliated interest provision which allows the WUTC to examine the costs of providing goods or services by an affiliated company with which a regulated company has a "contract or arrangement", before the affiliated company's charges will be allowed in the regulated company's rates.

Waste Management of Seattle, Inc. (Waste Management) filed a revision of its tariff with the WUTC in April 1991, to increase its rate for commercial solid waste collection from $47 per ton to $56 per ton. This increase covers, in part, a fee paid under a city ordinance to the City of Seattle (City) for landfill disposal costs. In its final order, the WUTC denied the rate increase because Waste Management failed to produce the financial records of two of its affiliated companies, Washington Waste Systems, Inc. (Washington Waste), and Oregon Waste Systems, Inc. (Oregon Waste), which were involved in the landfill disposal. Waste Manage-

ment appealed to superior court. The Superior Court determined that the WUTC is statutorily required by RCW 81.77.160 to approve this disposal fee as part of the company's permanent rate, that the WUTC cannot exclude these costs on the ground that there was a flow of payments to affiliated companies and that RCW 81.16.030, allowing the WUTC to examine financial records of an unregulated company affiliated with a regulated company where there is a contract or arrangement between the companies, does not apply. We affirm.

Waste Management of Seattle, Inc., collects commercial solid waste from its customers in Seattle and transports it to the Eastmont Transfer Station (Eastmont), paying Eastmont $56 per ton for disposal. Eastmont is an operating division of Waste Management of Seattle, Inc. Eastmont then processes the waste, places it into containers and transports it to the Union Pacific Intermodal Facility (Intermodal Facility). Eastmont pays the City $38.14 per ton to dispose of the waste at the Intermodal Facility, pursuant to a city ordinance. Washington Waste Systems, Inc., has a contract with the City to transport the waste in containers from the Intermodal Facility to the Columbia Ridge Landfill (Landfill) in eastern Oregon, at a cost of approximately $42 per ton.[1] The Landfill is operated by Oregon Waste. Washington Waste, Oregon Waste, and Waste Management are all subsidiaries of Waste Management of North America, Inc., which in turn is a subsidiary of Waste Management, Inc. Washington Waste, Oregon Waste, and Waste Management are affiliates, as defined by RCW 81.16.010.

During discovery, the WUTC's staff requested financial information from Oregon Waste and Washington Waste. Waste Management declined to provide the requested material on the grounds that the WUTC did not have the

---

[1]The disposal fee charged to the solid waste companies is less than the amount the City pays for disposal because of a subsidy. The City had paid funds to King County for the construction of a waste-to-energy facility. When this facility became unnecessary, King County returned the funds to the City and these funds are used to subsidize the rate charged by the intermodal facility.

authority to review the records of its affiliates under these circumstances. Waste Management asserted that because there is no "contract or arrangement" between Waste Management and the affiliated companies, the WUTC did not have the right to examine the costs to the affiliates under RCW 81.16.030.

The WUTC granted a motion by the WUTC staff to compel production. The WUTC determined that it had the authority to examine the records of the affiliated companies both under RCW 81.16.030 and under its general rate-making authority. To preserve the privacy of records produced, the WUTC issued a protective order preventing disclosure of confidential information. Waste Management continued to refuse to comply on the grounds that the WUTC had no authority to review the records of its affiliates. It also contended that the WUTC was required to approve the disposal fees as part of its permanent rates, without engaging in substantive inquiry, under the pass-through provisions of RCW 81.77.160.

An administrative law judge (ALJ) entered a third supplemental order in January 1992, rejecting the tariff filing in its entirety. The ALJ concluded that the WUTC was not required to approve the disposal fees without review and found that the WUTC could examine the financial records of the affiliates under RCW 81.16.030. The ALJ found these records were necessary for Waste Management to meet its burden of proving just and reasonable rates.

The WUTC reviewed the order of the ALJ and issued its fourth supplemental order denying an increase in rates. The WUTC also concluded that Waste Management had not met its burden of proving just and reasonable rates and that it was not required to accept the disposal charges until Waste Management demonstrated that the rates were reasonable. The WUTC determined that it had authority both under RCW 81.16.030 and under its general regulatory authority to examine the financial records of the affiliated companies.

In December 1992, the superior court set aside the WUTC's order. The court concluded that the WUTC was

required to permit a permanent pass-through of the disposal fees without substantive review, but the WUTC could review the charges to ensure that they fell under the pass-through provisions of RCW 81.77.160. Also, the WUTC may review charges where there are direct payments made and services or property provided between a regulated company and its unregulated affiliate under RCW 81.16.030. However, the court held that RCW 81.16.030 does not apply here and there is no general authority under which payments to affiliated companies may be disallowed.

The WUTC was granted direct review by this court under RAP 4.2(a)(4).

Review of the WUTC's determination in this proceeding is governed by RCW 34.05.570. Under the provisions relevant to this case, this court shall grant relief from the WUTC's order if it determines that the order is outside the statutory authority or jurisdiction of the agency or if the agency has erroneously interpreted or applied the law. We find that the WUTC has both erroneously interpreted the law and has acted beyond its statutory authority.

The first issue is whether RCW 81.77.160 requires the WUTC to approve a permanent pass-through of all charges for disposal of solid waste at a facility designated under a local solid waste management plan or ordinance. Waste Management argues that the WUTC must allow these charges in the company's *permanent* collection rates. The WUTC asserts that the provision provides only for a *temporary* pass-through and that the charges are still subject to substantive review to determine whether they are reasonable amounts before they will be included in the permanent rates.

Construction of a statute is a question of law which we review de novo under the error of law standard. *Pasco v. Public Empl. Relations Comm'n*, 119 Wn.2d 504, 507, 833 P.2d 381 (1992); *Inland Empire Distrib. Sys., Inc. v. Utilities & Transp. Comm'n*, 112 Wn.2d 278, 282, 770 P.2d 624, 87 A.L.R.4th 627 (1989). The courts retain the ultimate authority to interpret a statute. *Franklin Cy. Sheriffs Office v. Sellers*, 97 Wn.2d 317, 325-26, 646 P.2d 113 (1982),

*cert. denied,* 459 U.S. 1106 (1983). Whether an agency's construction of the statute is accorded deference depends on whether the statute is ambiguous. Where an agency is charged with the administration and enforcement of a statute, the agency's interpretation of an *ambiguous* statute is accorded great weight in determining legislative intent. *Pasco,* at 507 (citing *Cowiche Canyon Conservancy v. Bosley,* 118 Wn.2d 801, 813-14, 828 P.2d 549 (1992)). Absent ambiguity, however, there is no need for the agency's expertise in construing the statute. *Pasco,* at 509. Furthermore, we will not defer to an agency determination which conflicts with the statute. *Cowiche,* at 815.

We find that RCW 81.77.160 unambiguously requires the WUTC to include in a company's permanent rates the fee charged by a disposal facility which a solid waste disposal company is required to use by a local ordinance or local comprehensive solid waste management plan.

In enacting the "waste not Washington act" in 1989, providing for major solid waste reform, the Legislature added a new statutory provision now codified at RCW 81.77.160. This statute provides:

> The commission, in fixing and altering collection rates charged by every solid waste collection company under this section, shall include in the base for the collection rates:
>
> (1) All charges for the disposal of solid waste at the facility or facilities that the solid waste collection company is required to use under a local comprehensive solid waste management plan or ordinance designating disposal sites; and
>
> (2) All known and measurable costs related to implementation of the approved county or city comprehensive solid waste management plan.
>
> If a solid waste collection company files a tariff to recover the costs specified under this section, and the commission suspends the tariff, the portion of the tariff covering costs specified in this section shall be placed in effect by the commission at the request of the company on an interim basis as of the originally filed effective date, subject to refund, pending the commission's final order.

RCW 81.77.160.

In this case, the City has promulgated an ordinance specifying the site and cost for disposal of solid waste. Seat-

tle City Ordinance 115589 § 4, codified as Seattle Municipal Code 21.36.112, provides that:

> A. Union Pacific's Seattle Intermodal Facility or successor receiving facility specified by the City is hereby designated as the receiving facility for disposal of all waste . . . .All generators, handlers, and collectors of waste shall deliver or, for example, by taking waste to a City transfer station, shall ensure delivery of all waste to Union Pacific's Seattle Intermodal Facility or successor receiving facility designated by the City, in a manner specified by the Director of Engineering.

 RCW 81.77.160 unambiguously requires that certain, specific types of disposal costs are to be passed through to ratepayers. Both parties have cited to legislative history as support for their proposed construction. Although we will note that the legislative history supports the reading given by Waste Management, where a statute is unambiguous, we will determine the Legislature's intent from the language of the statute alone. *In re Eaton*, 110 Wn.2d 892, 898, 757 P.2d 961 (1988). The statute does not state that the pass-through of the disposal fee is to be temporary, pending substantive review. Rather, RCW 81.77.160 states that these charges shall be included in the base for collection rates. The use of the word "shall" imposes a mandatory duty. *Our Lady of Lourdes Hosp. v. Franklin Cy.*, 120 Wn.2d 439, 446, 842 P.2d 956 (1993).

Examining the regulatory statutes in their entirety further demonstrates that RCW 81.77.160 provides for permanent, not temporary, pass-through of these costs to customers. There already exists a provision which would allow a disposal fee to be considered an operating expense for inclusion in a company's rates, subject to substantive review by the WUTC. RCW 81.77.170 provides: "For rate-making purposes, a fee, charge, or tax on the disposal of solid waste shall be considered a normal operating expense of the solid waste collection company." This statute covers all costs relating to the disposal of solid waste, which are normal operating expenses allowable for inclusion in rates, subject to review for reasonableness by the WUTC. This general provision would govern the disposal fees involved

here, except that there is another, more specific provision which applies, RCW 81.77.160. A specific statute will supersede a general one when both apply. *General Tel. Co. of Northwest, Inc. v. Utilities & Transp. Comm'n*, 104 Wn.2d 460, 464, 706 P.2d 625 (1985). Thus, where the fee or costs fall under the specific provisions of RCW 81.77.160, then the WUTC must treat these costs differently by allowing a permanent pass-through of these items to customers without conducting substantive review. That these are reasonable costs has already been determined by the Legislature in singling out these costs for mandatory inclusion in a company's rates.

However, when a company files a tariff to include these costs in its permanent rates, the WUTC still needs to examine the costs to determine whether they fall under the specific provisions of RCW 81.77.160(1) or (2). During this examination period, the rates will go into effect on an interim basis, if the company so requests. Once the WUTC is satisfied that these charges fall under RCW 81.77.160, then the WUTC *shall* include these charges in the company's collection rates. If the charges do not fall under RCW 81.77.160, then, according to the statute, the company will need to refund those moneys to its customers.

Regardless of their mandatory nature, the pass-through provisions of RCW 81.77.160 do not preclude review under RCW 81.16.030, referring to transactions between affiliated interests. We will not read RCW 81.77.160 in a way to render another provision inoperative. Statutes relating to the same subject "are to be read together as constituting a unified whole, to the end that a harmonious total statutory scheme evolves which maintains the integrity of the respective statutes." *State v. Wright*, 84 Wn.2d 645, 650, 529 P.2d 453 (1974). Thus, we will read statutes as complementary, rather than in conflict with each other. *See Cossel v. Skagit Cy.*, 119 Wn.2d 434, 437, 834 P.2d 609 (1992). RCW 81.16.030 requires the WUTC to examine the records of an affiliated company when a payment is made to the affiliated company under a contract or arrangement between a regu-

lated company and an affiliated company. We hold that where the charges under RCW 81.77.160 also fall under RCW 81.16.030, the WUTC may conduct a substantive review for the reasonableness of these charges.

Through RCW 81.16.030, the Legislature has provided the WUTC with a mechanism under which it may examine the records of an affiliate of a regulated company where there is a "contract or arrangement" between the companies. Under RCW 81.16.030:

> In any proceeding . . . involving the rates or practices of any public service company, the commission may exclude from the accounts of such public service company any payment or compensation to an affiliated interest for any services rendered or property or service furnished, as above described, *under existing contracts or arrangements with such affiliated interest* unless such public service company shall establish the reasonableness of such payment or compensation. In such proceeding the commission shall disallow such payment or compensation, in whole or in part, in the absence of satisfactory proof that it is reasonable in amount. In such proceeding any payment or compensation may be disapproved or disallowed by the commission, in whole or in part, unless satisfactory proof is submitted to the commission of the cost to the affiliated interest of rendering the service or furnishing the property or service above described.

(Italics ours.) RCW 81.16.030.

It is undisputed that Oregon Waste, Washington Waste, and Waste Management are affiliated, as defined by RCW 81.16.010. The question is whether the factual situation presented by this case involves a "contract or arrangement" between Waste Management and its affiliates, within the meaning of RCW 81.16.030, which would allow the WUTC to review the records of these companies.

The Superior Court found that "Waste Management of Seattle has not entered into any contract or arrangement with either Washington Waste Systems or Oregon Waste Systems with respect to the transportation and disposal of solid waste collection by Waste Management of Seattle." Finding of fact 9; Clerk's Papers, at 397. Further, the Superior Court found that the "Commission had ample opportunity to explore whether . . . any contract or arrange-

ment existed between Waste Management of Seattle and either of those two entities." Finding of fact 11; Clerk's Papers, at 398.

 Waste Management argues that because the WUTC has not assigned error to these findings on appeal, the WUTC is bound by the findings of the Superior Court. However, if we are conducting our review on the administrative record, such an assignment of error to the superior court findings is not necessary. *See, e.g., Franklin Cy. Sheriffs Office v. Sellers*, 97 Wn.2d 317, 323-24, 646 P.2d 113 (1982). It is well established that under the previous administrative procedure act, review by an appellate court was on the entire record of the administrative tribunal, not of the superior court. *Inland Empire Distrib. Sys., Inc. v. Utilities & Transp. Comm'n*, 112 Wn.2d 278, 770 P.2d 624, 87 A.L.R.4th 627 (1988). We have held that the appellate court stands in the same position as the trial court when reviewing the decision of an agency. *Farm Supply Distribs., Inc. v. Utilities & Transp. Comm'n*, 83 Wn.2d 446, 448, 518 P.2d 1237 (1974).

The Legislature replaced the previous administrative procedure act with the new 1988 Administrative Procedure Act, to apply to administrative procedures begun after July 1, 1989. RCW 34.05.902. Furthermore, in 1989 the Legislature amended the provision relating to the relief the court may grant upon judicial review. A new sentence was added to RCW 34.05.574(1).

> The court shall set out in its findings and conclusions, as appropriate, each violation or error by the agency under the standards for review set out in this chapter on which the court bases its decision and order.

Laws of 1989, ch. 175, § 28. The effective date of this change was July 1, 1989. Laws of 1989, ch. 175, § 186.

This raises the issue of whether the findings and conclusions entered by a court pursuant to RCW 34.05.574 carry any weight for appellate review. For the following reasons, we hold that the appellate tribunal will continue to review administrative actions on the administrative, not superior court, record.

First, the terms "findings and conclusions" are contained in a provision relating to the type of relief a court may grant upon review of an agency action. It is not a provision governing further appellate review. In light of the dearth of legislative history on this matter, we have to determine the intent of the Legislature from the statutory language alone. Taken in context, the required findings and conclusions are for the purpose of granting effective relief, such as providing guidance to an agency on remand, or for clarification as to why an agency action is upheld or reversed, or why the superior court is ordering an agency to take a certain action.

Furthermore, under RCW 34.05.001, decisions made under the previous administrative procedure act are to remain in effect to the greatest extent possible. Indeed, our courts have continued to follow the previously established rule that the appellate tribunal will look to the administrative record, and not the superior court findings or conclusions, when conducting review. *See, e.g.*, *King Cy. v. State Boundary Review Bd.*, 122 Wn.2d 648, 672-73, 860 P.2d 1024 (1993); *Fisher v. Employment Sec. Dep't*, 63 Wn. App. 770, 822 P.2d 791 (1992).

Finally, although in nonadministrative proceedings the finder of fact is the trial court, in administrative proceedings facts are established at the administrative hearing and the superior court acts as an appellate court. RCW 34.05.558. The superior court does not take evidence or hear new issues unless the matter falls within the statutory exceptions of RCW 34.05.554 and .562. Thus, the normal rationale for deferring to findings of fact by the superior court is not present here. Contrary to the assertions of Waste Management, assignment of error to the superior court findings and conclusions is not necessary in review of an administrative action.

We will continue to adhere to the rule under the previous administrative procedure act that in reviewing adjudicative proceedings, review by an appellate court is to be on the agency record without consideration of the findings and conclusions of the superior court. The one exception is in regard

to matters where the superior court takes additional evidence under RCW 34.05.562 or examines an issue not raised before the agency under RCW 34.05.554. In such instances, where the information needed for review is contained in the superior court record of proceedings, not the agency record, the appellate tribunal will look to the superior court record.

Turning to the administrative record, the WUTC did find that "[t]his filing involves an arrangement or transaction among affiliates in which revenue from respondent's ratepayers flows to affiliates . . . ." Finding of fact 7; WUTC's Fourth Supplemental Order; Clerk's Papers, at 207-08. However, because the WUTC's finding that an indirect revenue flow is a transaction or arrangement violates the plain language of RCW 81.16.030 referring to "contracts or arrangements", we will accord it no weight.

The WUTC's focus is on the flow of payments, which begins with the customers of Waste Management and ends up in the accounts of Washington Waste and Oregon Waste. This indirect flow of payments might be subject to scrutiny as an arrangement between affiliates if it were the result of negotiations or an agreement *between* the companies. However, these payments were not made under a contract between the companies, but pursuant to a city ordinance mandating that the waste be brought to the Union Pacific Intermodal Facility and that the charge of $38.14 per ton be paid to the City. Reading this ordinance in conjunction with the statute requiring a pass-through of this type of charge demonstrates that it is the governmental bodies which have set up the flow of revenue and which mandate that these costs are to be an expense of the ratepayers. Because there is no contract or arrangement between affiliated companies within the meaning of the statute, the WUTC may not proceed under RCW 81.16.030. As Edward J. Nikula, Assistant Director, Water and Transportation, Washington Utilities and Transportation Commission, agreed to in his testimony before the agency, the $38.14 charge is "being paid entirely by Waste Management of Seattle to the City of

Seattle, and not by Waste Management of Seattle to either Washington Waste Systems, or Oregon Waste Systems". Deposition of Nikula; WUTC Record, at 1423.

The WUTC staff claimed during the proceeding that in order to ascertain whether there is a "contract or arrangement" it needs to "examine the books and records of Washington Waste Systems and Oregon Waste Systems in order to determine . . . if a contract or arrangement exists between Waste Management of Seattle and either or both of these affiliates". Testimony of Nikula; Clerk's Papers, at 143-44. The only records which the WUTC staff requested and to which access was denied were financial records, not contracts. Staff Data Request Number One requested financial statements of Oregon Waste for the year ending December 31, 1990, as follows: a balance sheet, income statement, pro forma income statement, and deferred income tax balance. Data Request Number Two requested the same for Washington Waste. Staff Data Requests; WUTC Record, at 41-42. There is nothing in the records or the WUTC's arguments which lends support to the contention of the staff that the financial records of the affiliated companies would have demonstrated whether there was a contract or arrangement, and that without these financial records it was impossible for them to determine whether there was a contract or arrangement. The disposal fee involved in this rate filing was made to the City, as required by ordinance. While it is true that the financial records might demonstrate that Washington Waste or Oregon Waste enjoys high profits, as argued by the WUTC, these records are not necessary for determination of whether there is a contract or arrangement between Waste Management and its affiliates. The WUTC is free to scrutinize both the Seattle Municipal Code and the City's contract with Washington Waste under which the payments are made.

We finally need to determine whether, in light of the conclusion that RCW 81.16.030 does not apply, the WUTC may examine the records of the affiliated companies under its general rate-making authority to ensure that rates are

just and reasonable. The WUTC has claimed throughout the proceedings that it may review financial records of affiliated companies under its general rate-making authority and its statutory mandate to establish just, fair, reasonable, and sufficient rates. RCW 81.77.030; RCW 81.28.230; RCW 81.04.130. Even if the affiliated interest provision does not apply here, the WUTC argues this does not affect the WUTC's general powers under which it may review the records of Washington Waste and Oregon Waste to insure that these companies do not receive excessive profits at the expense of Waste Management's ratepayers.

The WUTC bases this claim in part on the assertion that if the WUTC were limited to reviewing the records of affiliated companies only under the affiliated interest statute, the companies could structure themselves in a way which would avoid the statute and the scrutiny of the WUTC. In this particular situation, where the flow of payments is pursuant to a negotiated contract with a third party and mandated by the city ordinance, it is difficult to imagine how the company could structure itself in such a way as to be able to engage in self-dealing.

The WUTC argues that the specific affiliated interest statute should not be held to supersede its general statutory authority to review the records of affiliated interests if it is determined that the specific statute does not apply. For example, the WUTC points out that because RCW 81.16.030 does not apply to parent-subsidiary relationships, the WUTC has used its general rate-making authority to review transactions between parent and subsidiary companies.[2] Likewise, the WUTC argues that if the affiliated interest statute does not apply here because there is no "contract or arrangement", then it may proceed under authority conferred in other provisions to examine the financial records of an affiliate to ensure the affiliate is not enjoying excess profits at the ratepayers' expense.

---

[2]This claim remains untested by our appellate courts.

If this were true, and affiliated companies which met the definition of affiliates for purposes of RCW 81.16.030 could be scrutinized under the general powers of the WUTC, then the affiliated interest statute would be completely superfluous. This violates one of the tenets of statutory construction that " '[n]o part of a statute should be deemed inoperative or superfluous unless it is the result of obvious . . . error.' " *Cossel v. Skagit Cy.*, 119 Wn.2d 434, 437, 834 P.2d 609 (1992) (quoting *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 13, 810 P.2d 917, 817 P.2d 1359 (1991)). We hold that where a public service company is affiliated, as defined by RCW 81.16.010, with another company not under the WUTC's jurisdiction, but where there is no contract or arrangement between the companies, the WUTC does not have the authority to examine the records of the company affiliated with the public service company.

The WUTC claims authority under its general statutory powers to examine the records of Washington Waste and Oregon Waste in order to prevent excessive profits to these companies at the ratepayers' expense. If the WUTC had general authority to prevent excessive profits to unregulated companies in the absence of the affiliated interest statute applying, then it should have that authority in all rate cases involving those same unregulated companies. However, the disposal charges have been accepted as reasonable for another waste collection company without any claim of authority or request to review the records of Washington Waste or Oregon Waste. Rabanco Companies, doing business as Seattle Disposal Company, operates a solid waste collection company within the city of Seattle and filed a tariff which included the disposal fee at issue here. In March 1991, the WUTC staff recommended that the entire $38.14 be included in Rabanco's rates and the WUTC accepted that recommendation. In considering Rabanco's work papers in support of the rate, the WUTC staff stated in a memorandum that "[t]he data has been reviewed and $56.00 per ton does not appear to be excessive." Staff Memorandum; WUTC Record, at 1548. If the WUTC had

the authority to prevent excessive profits to an unregulated entity in the absence of RCW 81.16.030, then the WUTC should have acted in the Rabanco filing as it did in this case. Instead, the WUTC's authority to obtain records from unregulated companies stems from RCW 81.16.030.

The WUTC has cited case authority from other jurisdictions holding that for companies to prove reasonable rates, the companies will have to disclose financial information about payments to or from affiliated companies for goods or services. The general rationale for review of transactions between affiliated companies is fear of collusion in the absence of arm's-length dealings. As stated by the Idaho Supreme Court in a rate case involving a water company claiming expenditures to an affiliate,

> [t]he reason for this distinction between affiliate and non-affiliate expenditures appears to be that the probability of unwarranted expenditures corresponds to the probability of collusion. In dealing with *non-affiliates* the pressures of a competitive market and the fact of arm's length bargaining for goods and services allows us to assume, in absence of a showing to the contrary, that such operating expenditures are legitimate.

*Boise Water Corp. v. Idaho Pub. Utils. Comm'n*, 97 Idaho 832, 838, 555 P.2d 163 (1976). *See also Railroad Comm'n v. Rio Grande Vly. Gas Co.*, 683 S.W.2d 783, 786 (Tex. Ct. App. 1984) (under the Public Utility Regulatory Act, a utility company must make a showing of reasonableness "with respect to payments to affiliates about which the Legislature has its suspicion and which to any reasonable mind are clearly tainted with the possibility of self-dealing"); *In re General Tel. Co.*, 17 N.Y.2d 373, 382, 218 N.E.2d 274, 271 N.Y.S.2d 216, 224 (1966) (affiliates were "dealing with themselves and enjoying profits which were 'higher than either fairness or arm's-length bargaining would dictate.' "). It is significant that all of these cases involve contracts, or direct payments or sales, between affiliated companies. *See also Commonwealth Gas Servs., Inc. v. Reynolds Metals Co.*, 236 Va. 362, 374 S.E.2d 35 (1988); *Montana-Dakota Utils. Co. v. Montana Dep't of Pub. Serv. Regulation*, 231 Mont.

118, 752 P.2d 155 (1988); *Western Distrib. Co. v. Public Serv. Comm'n,* 285 U.S. 119, 76 L. Ed. 655, 52 S. Ct. 283 (1932). The WUTC has cited no case allowing examination of the records of an affiliate which involves an indirect revenue flow to an affiliated company pursuant to a negotiated contract with a third party.

The WUTC relies on *Western Distrib. Co.* for authority that a public utility commission may examine the earnings of affiliates of utility companies to prevent high profits to an affiliate, even where there is no evidence of self-dealing. The WUTC places weight on the fact that in that case, the rate between the regulated utility company and nonregulated company was first established before there was any affiliation between the companies. However, the WUTC has ignored the fact that although the companies set the amount before they were affiliated, the rate continued to be paid under a "day-to-day verbal contract". *Western Distrib. Co.,* 285 U.S. at 122. Thus, the rate was set on an ongoing basis, even after the companies became affiliated. In addition, that was not a case construing the authority of the WUTC under the laws of the State of Washington. It also involves more than an indirect flow of revenue. Instead, like the other cases cited by the WUTC, there was a contract between the affiliated companies.

In this case, the record is devoid of evidence that the contract under which the charges were set was the result of anything other than arm's-length negotiations between Washington Waste and the City. In 1989, the City decided to discontinue using King County's Cedar Hills Landfill for disposal of solid waste. The City sought proposals for transportation and landfill services. A proposal evaluation committee was formed and the committee unanimously chose the Washington Waste proposal, with a "significant margin over the other two proposals". Memorandum from T. Tierney to G. Zarker (Aug. 23, 1989) WUTC Record, at 259. The committee stated that

> Washington Waste Systems offers the City the security and reliability of an existing landfill, the location and design of

which provide environmental protection that may be unsurpassed anywhere in the nation. . . . WWSI offers long-term transportation and landfills services at an attractive price . . ..

Memorandum, *supra*; WUTC Record, at 259-60. The Mayor approved the choice of Washington Waste Systems as "superior on several dimensions". WUTC Record, at 262. After viewing the sites, meeting with officials, and a public hearing, the city council's Environmental Management Committee recommended that the City negotiate a contract with Washington Waste. The city council voted to accept the recommendation and negotiations began in January 1990. The contract formation process included a public hearing. The Council voted 8-to-1 to authorize signing of the final contract by the Mayor.

As the WUTC points out, there was involvement in the negotiations from officers of Washington Waste who were also officers of Waste Management. Nevertheless, the ultimate contract and the bidding process which allowed contract negotiations to begin was a competitive process. Also, although employees of Waste Management testified in favor of the contract at the public hearing, this testimony came long after negotiations had taken place and certainly after Washington Waste was awarded the bid. There is nothing in the record indicating that the City was coerced by any of the Waste Management companies to enter into the contract with Washington Waste. The WUTC director admitted in his deposition that he had no evidence that the contract between the City and Washington Waste was not the result of a fair and competitive process.

The extensive contract negotiation process which went on between the City and Washington Waste, and which is amply supported in the record, undercuts an argument that this contract is not based on arm's-length negotiations in a competitive market. Hence, the primary purpose for allowing review of the affiliated interest transaction is negated.

In conclusion, the WUTC does not have general authority to examine financial records of an unregulated company affiliated with a regulated company where there is no con-

tract or arrangement between that company and the regulated company. The WUTC is under a statutory mandate to include the charges specified under RCW 81.77.160 in a company's permanent rates once the company establishes that the charges fall under that statute. The WUTC may undertake examination of those charges under RCW 81.16-.030, provided that the charges were set pursuant to a direct contract or arrangement between affiliated companies. Such a contract or arrangement is not present here.

The order of the Washington Utilities and Transportation Commission rejecting the tariff of Waste Management of Seattle, Inc., is set aside. We order the WUTC to approve the $38.14 per ton charge as part of Waste Management's permanent rates.

ANDERSEN, C.J., and UTTER, DOLLIVER, DURHAM, SMITH, GUY, JOHNSON, and MADSEN, JJ., concur.

After modification, further reconsideration denied May 5, 1994.