[No. 44283-3-II.   Division Two.   May 13, 2014.]

JAY GEROW ET AL., *Appellants*, v. THE WASHINGTON STATE GAMBLING COMMISSION, *Respondent*.

230

Joan K. Mell (of III Branches Law PLLC), for appellants.

Robert W. Ferguson, Attorney General, and Callie A. Castillo, Assistant, for respondent.

¶1 LEE, J. — Jay Gerow and ZDI Gaming, Inc. (ZDI) appeal the superior court's dismissal of their petition to invalidate two Washington State Gambling Commission (Commission) regulations under the Administrative Procedure Act (APA), RCW 34.05.570(2)(c). ZDI argues that WAC 230-14-047 ("Standards for electronic video pull-tab dispensers") and WAC 230-06-003 ("Defining 'cash' ") are invalid because, inter alia, the Commission adopted them without a three-vote majority as required by the "Gambling Act," ch. 9.46 RCW. We agree.

¶2 Any rules adopted by the Commission relating to the regulation of licensing statutorily require at least three of five votes by commission members. WAC 230-14-047 and 230-06-003 both relate to the regulation of licensing, and the Commission promulgated these rules with only two votes. Because these rules were "adopted without compliance with statutory rule-making procedures," we reverse the superior court's ruling that WAC 230-14-047 and 230--06-003 are valid and invalidate both rules. RCW 34.05-.570(2)(c). Additionally, we award ZDI its attorney fees and costs on appeal and remand to the superior court to award attorney fees below.

## FACTS

A. BACKGROUND

¶3 ZDI is a commission-licensed gaming supply distributorship that manufactures electronic video pull-tab dis-

pensers.[1] In 1994, the legislature specifically included "video pull-tabs," along with video poker and slot machines, as types of "gambling device[s]" that are illegal in Washington. RCW 9.46.0241. Despite this limitation, two gambling device manufacturers (including ZDI) created "electronic video pull-tab dispensing devices" that the Commission approved in 1997 and 2002. Admin. Record (AR) at 119.

¶4 ZDI's first electronic pull-tab dispensing machine incorporated a pull-tab dispenser and a pull-tab reader housed in a decorative cabinet designed to emulate a video slot machine. Although the machine did not contain drums or spinning reels, the video display contained rows of "spinning" pictures and simulated the play of a casino-style slot machine. AR at 202. In addition to mimicking a slot machine, these machines emitted "attractor" sounds, also commonly associated with casinos. AR at 202. The Commission approved this equipment in 2002.

¶5 ZDI's updated machine, the VIP, is nearly identical to the equipment the Commission approved in 2002; the primary difference is that the VIP machine incorporates cash card technology. As we explained in a previous opinion involving this technology:

> The earlier versions of the machine required a player to purchase the pull tab with currency and required that players redeem all winning pull tabs with a cashier. The VIP machine disposes of these steps by allowing a player to purchase pull tabs with a prepaid "cash card" and automatically crediting pull tab winnings of $20 or less back onto the "cash card." For winning pull tabs in excess of $20, the VIP machine directs the player to seek payment from an employee. If a player stops playing the game before depleting the "cash card," the player can use the remaining credit to purchase food, drink, or mer-

---

[1] Pull-tabs predate the 1973 legalization of limited types of gambling in the state of Washington. Administrative Record at 201. A standard pull-tab is a paper ticket with a series of windows concealing numbers or symbols; certain number or symbol combinations entitle the player to a prize. WAC 230-14-010. Each pull-tab series has a predetermined number of winning tickets. WAC 230-14-035.

chandise, or the player can simply turn the credit back into cash. The "cash card" operates as a means by which a player can purchase pull tabs and receive winnings of less than $20; the odds of winning for any individual player do not change from use of the "cash card."

*ZDI Gaming, Inc. v. Wash. State Gambling Comm'n*, 151 Wn. App. 788, 797, 214 P.3d 938 (2009), *aff'd*, 173 Wn.2d 608, 268 P.3d 929 (2012).

B. PROCEDURAL HISTORY

¶6 In 2005, ZDI submitted an application to the Commission seeking permission to distribute its VIP machine with cash card technology. The Commission denied the permit request, relying heavily on former WAC 230-30-070(1) (2001), which stated that "[a]ll prizes from the operation of punch boards and pull-tabs shall be awarded in cash or in merchandise." AR at 346-47. The Commission also determined that the VIP machine was an illegal "gambling device." Clerk's Papers at 330. ZDI filed a petition for declaratory relief, and in August 2007, the superior court ruled that the Commission acted arbitrarily and capriciously in denying ZDI's permit to distribute its VIP machine.[2]

¶7 In September 2007, concerned about the potential impact of the superior court's ruling, the Commission began discussing

whether these electronic video pull-tab dispensing devices: 1) Are consistent with the Commission's legislative authorization to define a pull-tab game; 2) Are consistent with the original

_____

[2] The Commission appealed this decision. In *ZDI Gaming*, 151 Wn. App. at 809-10, we held:

Although the ZDI "cash card" is not, in and of itself, cash or a universally accepted equivalent, a player must tender either cash or a universally accepted equivalent to obtain the card. The cards may not be purchased on credit. . . . The record does not support the Commission's determination that ZDI "cash cards" are not cash equivalents satisfying its regulatory definition.

The Supreme Court affirmed our decision, reasoning that "the VIP cash card is functionally equivalent to cash." 173 Wn.2d at 622.

authorizing rules [allowing pull-tab gaming under the Gambling Act]; and 3) [whether the VIP machine authorized] by the [superior] court increase[s] the possibility of an unintentional expansion of electronic machine gambling in Washington.

AR at 10; *see also* Comm'n Meeting Transcription (CMT) (Sept. 14, 2007) at 5-6. This discussion led to three rule proposals related to electronic pull-tab dispensers.

¶8 Commission staff presented the first proposed rule, which would have amended WAC 230-14-045 ("Authorized pull-tab dispensers") to specifically ban all electronic pull-tab dispensers—effectively eliminating technology the Commission had approved in 1997. AR at 15; CMT (Sept. 14, 2007) at 6-7. One member of the Commission described this proposal as

> draconian because it was designed to get everybody involved in this process to recognize the need that if we can't get rules that are clear to everybody, then we're just not going to have these machines at all. But we will, because I know that people would be able to get together and make a set of rules that are clear and understandable so we won't be litigating for the rest of our lives.

Comm'n Public Meeting Transcription (CMPT) (Oct. 12, 2007) at 32.

¶9 Commission staff also presented the second proposed rule, designated as "ALTERNATIVE #1," which stated:

> Electronic video pull-tab dispensers must be approved by us prior to use, meet the requirements below, and may incorporate only the features below and not perform additional functions.
>
> (1) Electronic video pull-tab dispensers must dispense a paper pull-tab as defined in WAC 230-14-010 and follow the rules for:
>
> (a) Pull-tabs; and
>
> (b) Flares; and
>
> (c) Authorized pull-tab dispensers.
>
> (2) Electronic video pull-tab dispensers that use a reading and displaying function must:

(a) Use a video monitor for entertainment purposes only; and

(b) Open all, or a portion of, the pull-tab in order to read encoded data that indicates the win or loss of the pull-tab if the dispenser is equipped to automatically open pull-tabs; and

(c) Dispense the pull-tab to the player and not retain any portion of the pull-tab; and

(d) Read the correct cash award from the pull-tab either when it is dispensed or when the pull-tab is reinserted into the dispenser; and

(e) Display the cash award from the pull-tab, one pull-tab at a time; and

(f) Provide:

(i) An electronic accounting of the number of pull-tabs dispensed; and

(ii) A way to identify the software version and name; and

(iii) A way to access and verify approved components; and

(iv) Security on the dispenser to prevent unauthorized access to graphic and prize amount displays.

(3) Gift certificates or gift cards used in electronic video pull-tab dispensers must:

(a) Be purchased with cash, check or electronic point-of-sale bank transfer before use in the dispenser; and

(b) Be convertible to cash at any time during business hours; and

(c) Subtract the cash value for the purchase of the pull-tab one pull-tab at a time.

AR at 8. Alternative #1 also included a proposed rule defining "cash" for all of Title 230 of the Washington Administrative Code:

"Cash," when used as a noun in this title, means currency in the form of coins or bills issued by the government of the United States or Canada only and does not include electronic, digital or other representations of money or other methods of payment.

AR at 9.

¶10 The pull-tab industry presented the third proposed rule, designated as "ALTERNATIVE #2." This proposed rule

was substantially similar to Alternative #1, except that it would allow pull-tab dispensers to "add prizes twenty dollars or less to a cash card upon insertion of the winning pull-tab." AR at 18-19.

¶11 After gathering extensive information from pull-tab industry stakeholders and holding a number of public meetings addressing the three proposed rules, the Commission voted in January 2008 to adopt Alternative #1, which included the proposed rule defining "cash." CMPT (Jan. 11, 2008) at 16-19. Hence, Alternative #1 became WAC 230-14-047 and the rule defining "cash" became WAC 230-06-003. Although a quorum of three of five commissioners was present for purposes of holding a meeting, RCW 9.46.050(2), only two of the three commissioners present voted in favor of adopting the new rules.

¶12 In February 2008, ZDI commenced this action against the Commission in Thurston County Superior Court, challenging WAC 230-14-047 and 230-06-003 under the APA. In April 2009, the superior court stayed the proceeding pending the outcome of the Commission's appeal of the August 2007 superior court order ruling that the Commission had acted arbitrarily and capriciously in refusing to permit ZDI's VIP machine. After our Supreme Court upheld the August 2007 superior court order, the stay was lifted in June 2012.

¶13 ZDI then moved to supplement the agency rule-making file with depositions of commission members and staff, purportedly to show that commission members adopted the new WACs out of loyalty to tribal gaming interests or in response to the pending ZDI lawsuit. ZDI also sought to supplement the rule-making file with evidence that in the past, the Commission had adopted new rules only when at least three members voted in support of

adoption. The superior court denied ZDI's motion to supplement the rule-making file.[3]

¶14 After hearing oral argument and considering the parties' briefs, the superior court ruled that the Commission did not violate the Gambling Act or the APA in adopting WAC 230-06-003 and 230-14-047. ZDI appeals.

## ANALYSIS

¶15 ZDI argues that WAC 230-14-047 and 230-06-003 are invalid because the Commission adopted them without complying with statutory rule-making procedures of the Gambling Act or the APA. The Commission contends that the rules at issue do not relate the Commission's licensing activities; therefore, a majority vote of a quorum of members (here, two votes out of a quorum of three) was sufficient under the Gambling Act and the APA. We agree with ZDI that the Commission adopted the rules in violation of the Gambling Act.

A. STANDARD OF REVIEW

¶16 The APA governs our review of agency rule making. In reviewing an agency rule-making action, we sit in the same position as the superior court and our review is, in general, limited to the record before the agency. *Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n*, 149 Wn.2d 17, 24, 65 P.3d 319 (2003). In a proceeding involving review of agency rules, we will declare the rules invalid only if (1) the rules violate constitutional provisions, (2) the

---

[3] ZDI challenges this ruling on appeal. However, ZDI has failed to articulate how the trial court manifestly abused its discretion in denying ZDI's motion to supplement the rule-making record and fails to discuss any of the provisions of the APA that allow a reviewing court to supplement an agency record (i.e., RCW 34.05.562). *Lund v. Dep't of Ecology*, 93 Wn. App. 329, 334, 969 P.2d 1072 (1998) (citing *Riss v. Angel*, 80 Wn. App. 553, 562, 912 P.2d 1028 (1996), *aff'd*, 131 Wn.2d 612, 934 P.2d 669 (1997)). "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290, *review denied*, 136 Wn.2d 1015 (1998); *see also* RAP 10.3(a)(6). Accordingly, we do not further address this argument.

agency exceeded its statutory authority in adopting the rules, (3) the agency adopted the rules without complying with statutory rule-making procedures, or (4) the rules are arbitrary and capricious. RCW 34.05.570(2)(c). As the party asserting the invalidity of the rules, ZDI bears the burden of demonstrating their invalidity. RCW 34.05.570(1)(a).

¶17 We review questions of statutory interpretation de novo. *Estate of Haselwood v. Bremerton Ice Arena, Inc.*, 166 Wn.2d 489, 497, 210 P.3d 308 (2009). When construing a statute, our objective is to ascertain and carry out the legislature's intent. *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010).

¶18 Statutory interpretation begins with the statute's plain meaning. *Lake*, 169 Wn.2d at 526. We discern plain meaning from the ordinary meaning of the language at issue, the statute's context, related provisions, and the statutory scheme as a whole. *Lake*, 169 Wn.2d at 526. When faced with an unambiguous statute, we derive the legislature's intent from the statute's plain language alone. *Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 629, 869 P.2d 1034 (1994).

¶19 When a statute is ambiguous, however, we will " 'resort to principles of statutory construction, legislative history, and relevant case law to assist in [its interpretation].' " *Yousoufian v. Office of King County Exec.*, 152 Wn.2d 421, 434, 98 P.3d 463 (2004) (quoting *State v. Watson*, 146 Wn.2d 947, 955, 51 P.3d 66 (2002)). A statute is ambiguous if it can be reasonably interpreted in more than one way. *Yousoufian*, 152 Wn.2d at 433-34 (quoting *Vashon Island Comm. for Self-Gov't v. Wash. State Boundary Review Bd.*, 127 Wn.2d 759, 771, 903 P.2d 953 (1995)).

B. VOTING REQUIREMENTS

¶20 ZDI argues that WAC 230-14-047 and 230-06-003 are invalid because the Commission adopted these rules without complying with statutory rule-making procedures of the Gambling Act, which requires an affirmative vote of

at least three of five commission members to promulgate new rules related "to the regulation of licensing." RCW 9.46.050(2). The Commission contends that "the rules at issue relate to allowable standards for [electronic video pull-tab dispensers] and are not related to the Commission's process for issuing, denying, revoking, etc. the license of persons, associations, or organizations carrying on specific gambling activities"; therefore, a majority vote of two members of a three-member quorum was sufficient. Br. of Resp't at 18.

¶21 Both parties also argue that the APA supports their respective positions on voting requirements. ZDI argues that under RCW 34.05.010(4), all rule-making decisions must be approved by a majority of the total membership of an agency or commission's governing body. Citing the same provision, the Commission argues that the APA requires only a majority vote of a sitting quorum for agencies or commissions to promulgate new rules.

1. Voting Requirements under the Gambling Act

¶22 The Gambling Act created the five-person Commission. RCW 9.46.040. RCW 9.46.050(2) states, "A majority of the members shall constitute a quorum of the commission: PROVIDED, *That all actions of the commission relating to the regulation of licensing under this chapter shall require an affirmative vote by three or more members of the commission.*" (Emphasis added.) Here, we must decide whether WAC 230-14-047 and 230-06-003 relate to the "regulation of licensing under this chapter." If so, the Commission violated the Gambling Act's affirmative three-vote requirement when promulgating these new rules.

¶23 The term "license" is not defined in the Gambling Act or in Title 230 of the Washington Administrative Code. RCW 9.46.310, however, discusses the type of license needed for the "manufacture, sale, distribution, or supply of gambling devices":

> No person shall manufacture, and no person shall sell, distribute, furnish or supply to any other person, any gambling device,

including but not limited to punchboards and pull-tabs, in this state, or for use within this state, without first obtaining a license to do so from the commission under the provisions of this chapter.

Such licenses shall not be issued by the commission except respecting devices which are designed and permitted for use in connection with activities authorized under this chapter: PROVIDED, That this requirement for licensure shall apply only insofar as the commission has adopted, or may adopt, rules implementing it as to particular categories of gambling devices and related equipment.

This provision was adopted in 1981 and appears separately from RCW 9.46.070(4), which authorizes the Commission to issue year-long licenses "to any person, association, or organization [engaged] in the selling, distributing, . . . or in the manufacturing of devices for use within this state."

¶24 "Statutes are to be read together, whenever possible, to achieve a 'harmonious total statutory scheme . . . which maintains the integrity of the respective statutes.'" *State ex rel. Peninsula Neigh. Ass'n v. Dep't of Transp.*, 142 Wn.2d 328, 342, 12 P.3d 134 (2000) (alteration in original) (internal quotation marks omitted) (quoting *Employco Pers. Servs., Inc. v. City of Seattle*, 117 Wn.2d 606, 614, 817 P.2d 1373 (1991)). Moreover, "[s]tatutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous." *Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996).

¶25 Here, when read together, RCW 9.46.310 and 9.46-.070(4) show that the legislature intended two separate licensing requirements. Under RCW 9.46.070(4), a company that manufactures approved gambling devices must have a license to do so. In addition, RCW 9.46.310 requires that each approved device also be licensed. Accordingly, because

WAC 230-14-047 and 230-06-003[4] address requirements that electronic video pull-tab dispensers must meet before receiving approval (i.e., licensure), three affirmative votes were required before the Commission could promulgate the rule.

¶26 Additionally, the Gambling Act explicitly states that although the Commission has the power and responsibility to "adopt such rules and regulations as are deemed necessary to carry out the purposes and provisions of [the Gambling Act]," all such rules and regulations must be "adopted pursuant to the administrative procedure act, chapter 34.05 RCW." RCW 9.46.070(14).

¶27 The APA includes a definition of "license":

"License" means a franchise, permit, certification, approval, registration, charter, or similar form of authorization required by law, but does not include (i) a license required solely for revenue purposes, or (ii) a certification of an exclusive bargaining representative, or similar status, under a collective bargaining law or similar statute, or (iii) a license, franchise, or permission for use of trademarks, symbols, and similar property owned or controlled by the agency.

RCW 34.05.010(9)(a). The APA also states that a "rule" is an "agency order, directive, or regulation of general applicability . . . which establishes, alters, or revokes any mandatory standards for any product or material which must be met before distribution or sale." RCW 34.05.010(16)(e).

¶28 Here, the new WACs at issue clearly constitute new rules relating to the regulation of licensing under the APA. WAC 230-14-047 and 230-06-003 both impact the licensing (i.e., permitting or approval) of electronic video pull-tab

---

[4] The new WAC defining "cash" directly impacts the VIP machine (and its potential to be permitted/licensed) because WAC 230-14-047(3)(a) requires that gift cards used in the machine must be "purchased with cash, check or electronic point-of-sale bank transfer before use in the dispenser." By eliminating the possibility of purchasing more pull-tabs with a "cash equivalent" (specifically, with credit accruing on the gift card for winning prizes under $20), WAC 230-14-047(3)(a) and 230-06-003 (when read together) guarantee that ZDI's new version of the VIP cannot be permitted/licensed.

dispensers, like the machine designed by ZDI. Additionally, both regulations fall squarely under the APA's definition of a "rule" because they establish mandatory standards for electronic video pull-tab dispensers. Thus, under the APA, these were rules that relate to "the regulation of licensing," requiring an affirmative vote of three or more members of the Commission to adopt.[5]

## 2. Voting Requirements under the APA

¶29 The only provisions in the APA explicitly related to voting requirements involve the voting provisions of the joint administrative rule reviews committee—a "bipartisan committee consisting of four senators and four representatives from the state legislature" that reviews proposed agency rules. RCW 34.05.610, .620, .630, .640. Indeed, voting requirements and the term "quorum" do not appear anywhere in the APA. Nevertheless, both ZDI and the Commission argue that the APA itself has a voting requirement provision, citing to RCW 34.05.010(4).

¶30 RCW 34.05.010(4) states, " 'Agency head' means the individual or body of individuals in whom the ultimate legal authority of the agency is vested by any provision of law. If the agency head is a body of individuals, a majority of those individuals constitutes the agency head." ZDI believes this definitional provision supports its view that all agency rule making must be approved by a majority vote of the commission's members (i.e., three members). The Commission, on the other hand, contends that the provision supports a majority vote of a quorum requirement. We disagree

---

[5] The Commission argues that "ZDI's expansive reading of the proviso [RCW 9.46.050(2)] and the definition of 'license' under the APA overshadows the majority rule requirement [that a majority of a quorum is sufficient for agency action], as one could argue that virtually every action by the Commission 'relates' in some way to licensing." Br. of Resp't at 17-18. While this may be true, it is not unreasonable to assume that the legislature intended nearly every rule adopted by the Commission to be promulgated with at least three votes as this ensures that every new rule impacting gambling—perhaps the most highly regulated industry in the State—has been duly considered and approved by a majority of the Commission.

that RCW 34.05.010(4) incorporates a specific voting requirement.

¶31 First, nothing in RCW 34.05.010(4) actually describes agency voting or voting requirements. This is simply a definitional provision intended to differentiate between the agency as a whole, including all of its employees, and those particular individuals with vested legal authority in final decisions involving agency operations.[6]

¶32 Second, it is a standard maxim of statutory construction that "[a] specific statute will supersede a general one when both apply" in a given situation. *Waste Mgmt. of Seattle*, 123 Wn.2d at 630. Here, RCW 9.46.050(2)'s three-vote requirement is clearly more specific than any potential voting requirement that may be read into the definition of "agency head" in RCW 34.05.010(4). Accordingly, even if we were to read a voting requirement into the APA, which we do not, the more specific provision of RCW 9.46.050(2) would still control in these circumstances.

¶33 Finally, the APA specifically states, "Each agency may adopt rules governing the formal and informal procedures prescribed or authorized by this chapter and rules of practice before the agency." RCW 34.05.220(1)(a). There is no provision in the APA that addresses quorum or voting requirements generally applicable to all administrative agencies. Instead, the legislature and the agencies themselves address the question of voting requirements for specific agencies, boards, and commissions. Throughout the Revised Code of Washington, the legislature has frequently inserted specific quorum and voting requirements for agency boards and commissions—such as RCW 9.46.050(2)'s

---

[6] Washington's APA is largely based on the 1981 Model State Administrative Procedure Act (MSAPA). 15 U.L.A. 1 (2000). The comments to the 1981 MSAPA's definitional section state that the term "agency head" is used to "differentiate for some purposes between the agency as an organic entity that includes all of its employees, and those particular individuals in whom the final legal authority over its operations is vested." MSAPA, § 1-102 cmt., 15 U.L.A. 13.

three vote requirement.[7] In other circumstances, the legislature has remained silent on voting requirements and, instead, agencies have themselves promulgated such rules under the APA's authority, RCW 34.05.220(1)(a).[8]

¶34  Here, the legislature has clearly instructed the Commission that, when adopting new rules related to the regulation of licensing, three affirmative votes are required. The APA does not dictate a different result.

■■ ¶35  We hold that WAC 230-14-047 and 230-06-003 are invalid because both provisions relate to the regulation of licensing, and RCW 9.46.050(2) requires the affirmative vote of at least three commission members before promulgating such rules.[9] Accordingly, these rules were adopted

---

[7] For instance, the enabling statute of the Washington State Medical Quality Assurance Commission states,

> The affirmative vote of a majority of a quorum of the commission is required to carry any motion or resolution, to adopt any rule, or to pass any measure. The commission may appoint panels consisting of at least three members. A quorum for the transaction of any business by a panel is a minimum of three members. A majority vote of a quorum of the panel is required to transact business delegated to it by the commission.

RCW 18.71.015. To give just a few more examples, code provisions for the Growth Management Hearings Board (RCW 36.70A.270(4)), the Board of Naturopathy (RCW 18.36A.150(5)), the Utilities and Transportation Commission (RCW 80.01-.050), the Fish and Wildlife Commission (RCW 77.04.060), and the Public Employment Relations Commission (RCW 41.58.010(3)) all contain specific provisions related to quorum voting requirements.

[8] For example, quorum requirements for the Office of the Secretary of State's Electronic Recording Standards Commission (WAC 434-661-140), the Washington Higher Education Facilities Authority (WAC 253-02-050), the Forest Practices Board (WAC 222-08-040), and the Forensic Investigations Council (WAC 218-04--040) are all addressed in the Washington Administrative Code.

[9] After oral argument, the Commission submitted a statement of additional authorities pursuant to RAP 10.8 informing us that on April 11, 2014, the Commission adopted amendments to WAC 230-14-047. The amendments, effective May 12, 2014, allow pull-tab prizes of 20 dollars or less to be added to cash cards (as originally proposed by pull-tab industry members in Alternative #2). It is unclear from the statement of additional authorities whether these amendments were adopted with the affirmative vote of three commission members, which was the primary issue the parties have asked us to address on appeal. ZDI maintained at oral argument that the Commission's adoption of the amendments would not affect this appeal. Wash. Court of Appeals oral argument, *Jay Gerow v. Wash. State Gambling Comm'n*, No. 44283-3-II (Feb. 27, 2014) (on file with the court).

"without compliance with statutory rule-making procedures" that bind the Commission. RCW 34.05.570(2)(c).[10]

## C. ATTORNEY FEES

▮ ¶36 ZDI requests attorney fees and costs under the Equal Access to Justice Act (EAJA). RCW 4.84.350. Under the EAJA, a party that prevails in a judicial review of an agency action is entitled to attorney fees and other expenses up to $25,000 unless "the court finds that the agency action was substantially justified or that circumstances make an award unjust." RCW 4.84.350(1). To be entitled to an award of attorney fees under the EAJA, a qualified party is deemed to have prevailed if that party obtained relief on a significant issue. RCW 4.84.350(1). The EAJA also states that "[i]f two or more qualified parties join in an action, the award in total shall not exceed twenty-five thousand dollars."[11] RCW 4.84.350(2). Because the record does not support the conclusion that the Commission "was substantially justified" in promulgating WAC 230-14-047 and 230-06-003 (especially with only two members voting in support of the new rules) or that awarding ZDI fees would be unjust, ZDI is entitled to an award of attorney fees. Therefore, we grant ZDI's request for attorney fees in an amount to be determined by a commissioner of this court subject to compliance with RAP 18.1(d).

▮ ¶37 Finally, the Supreme Court has held that the "stated purpose of the EAJA, indicates legislative intent to

---

Accordingly, we do not assume the adoption of these amendments moots ZDI's arguments as to the improper promulgation of WAC 230-14-047.

[10] ZDI also argues that WAC 230-14-047 and 230-06-003 should be invalidated because the Commission adopted these rules without preparing a Small Business Economic Impact Statement as required by the Regulatory Fairness Act, RCW 19.85.040 or, alternatively, that the Commission acted arbitrarily and capriciously in adopting these rules. Because we invalidate the rules on the grounds that they were adopted without adherence to statutory rule-making procedures, we do not address these remaining contentions.

[11] ZDI argues that it should be entitled to $50,000 for each level of judicial review because Gerow is also involved. RCW 4.84.350(2), however, clearly bars this type of double recovery.

award fees for each level of judicial review before each court" that a case has proceeded through. *Costanich v. Dep't of Soc. & Health Servs.*, 164 Wn.2d 925, 932, 194 P.3d 988 (2008). Accordingly, we remand to the superior court to determine an award of reasonable attorney fees for that level of judicial review. *Devine v. Dep't of Licensing*, 126 Wn. App. 941, 956, 110 P.3d 237 (2005).

¶38 We reverse the superior court's ruling that WAC 230-14-047 and 230-06-003 are valid, invalidate both rules, award ZDI its attorney fees and costs on appeal, and remand to the superior court to award attorney fees below.

WORSWICK, C.J., and JOHANSON, J., concur.