FILED
COURT OF APPEALS
DIVISION II

2013 APR 30  AM 8:34

STATE OF WASHINGTON

BY_____
           DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SPRINT SPECTRUM, LP, | No. 42304-9-II |
| Respondent/Cross Appellant, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE, | PUBLISHED OPINION |
| Appellant/Cross Respondent. | |

QUINN-BRINTNALL, J. — The Department of Revenue (DOR) assessed use tax on wireless phones Sprint Spectrum, LP (Sprint) had fully discounted and "sold" to customers—for $0.00—who signed extended term wireless service agreements. Sprint successfully appealed the use tax assessment to the Board of Tax Appeals (the Board), arguing that it recovers the cost of the free phones through sales of wireless phone service (on which it collects retail sales tax every month). Sprint also successfully argued that it was not a consumer of the free phones it provided to customers but, instead, was a retailer who resold the phones in conjunction with wireless service plans.

DOR appeals the Board's decision, asserting that Sprint is liable for use tax because it does not "resell" fully-discounted phones but, instead, acts as a consumer distributing the fully-discounted wireless phones primarily for the purpose of promoting the sale of its wireless

telephone services.[1]  Because the Board's decision contains factual findings contrary to the evidence in the record, the Board erroneously interpreted and applied the law, and we settled this issue on almost identical facts in *Activate, Inc. v. Department of Revenue*, 150 Wn. App. 807, 209 P.3d 524 (2009), we reverse the Board's decision.  RCW 34.05.570(3)(d)-(e).

## FACTS

In 2007, DOR assessed Sprint with various state taxes for the audit period July 1, 1999, through December 2002, including $85,946 of unreported use tax on fully-discounted wireless phones Sprint "sold" to customers for $0.00.  DOR assessed the tax, pursuant to former RCW 82.12.020(1) (2002),[2] on the grounds that Sprint "provided free cell phones to customers for the primary purpose of promoting the sale of its wireless services."  Administrative Record (AR) at 155.  Sprint paid DOR's use tax assessment but appealed the assessment decision to DOR's Appeals Division, arguing that as a retailer of wireless phones, it was not subject to consumer use tax on phones it sold to customers—including phones "sold" for $0.00.  The Appeals Division disagreed; after losing that appeal, Sprint appealed to the Board.

The parties stipulated to a number of facts for the Board appeal, including

(1) "[d]uring the audit period, Sprint sold wireless telephone services, wireless telephones, and accessories."  AR at 836.  "All cell phones transferred from Sprint to a customer were configured to be used with Sprint's wireless services."  AR at 841.
(2) "Sprint arranged for cell phone manufacturers to send the cell phones it purchased to a warehouse in Kentucky, from which the cell phones were

---

[1] Sprint initially cross appealed a separate issue addressed by the Board:  whether Sprint's service to certain customers qualified as a "residential class of telephone service" exempt from sales tax.  The parties have resolved that dispute and that issue is no longer before us.

[2] To avoid confusion, we cite the 2002 version of Title 82 RCW unless otherwise indicated.  The substantive provisions of the statutes have changed little since 2002.  However, the numbering of various sections and subsections is different in some instances.

shipped to Sprint retail outlets for sale in various states, including Washington. Sprint purchased these cell phones from manufacturers without paying retail sales tax on the purchases." AR at 840-41.

(3) "During the audit period, Sprint sold some cell phones to customers at what was termed their 'regular price'. Sprint collected retail sales tax from customers on the regular price. These were typically sales in which the customer was not purchasing any wireless service or was purchasing wireless service on a month-to-month basis." AR at 841.

(4) "During the audit period, Sprint sold most cell phones to customers at partial discounts off the regular price, including discounts that were conditioned upon the customers signing a service agreement legally binding them to purchase wireless service from Sprint for a term, typically 1 or 2 years, either as a new customer or as a returning customer." AR at 841. Typically, Sprint offered its customers discounts on the purchase price of wireless phones in accordance with the length of the service contract a customer was willing to sign.[3] For example, at the time of the audit, customers signing a one-year contract for wireless telephone services would receive a $75 discount off the purchase price of a phone while customers signing a two-year contract would get a $150 discount. DOR did not assess use tax on phones sold at discounted rates so long as the discount did not result in a customer receiving a free phone. These "partial cost sales" were not at issue in the Board appeal.

(5) Because of discounts—especially the discount customers received by signing long-term wireless service agreements—Sprint ended up "transferr[ing] some cell phones to customers at discounts equal to the regular price" during the audit period. AR at 842. Sprint collected no retail sales tax on these "fully-discounted" phones and, at the point of sale, customers received a receipt reflecting a purchase price of the phone as $0.00. DOR's use tax assessment solely involved these "free" wireless phones.

(6) Sprint's monthly wireless service rates did not vary depending upon whether a customer bought an undiscounted, partially-discounted, or fully-discounted phone.

The parties argued the case before the Board on August 19, 2010. Sprint called Sprint Senior State Tax Counsel Anthony Whalen to testify. Whalen explained that Sprint loses almost $100 on every phone it sells and that Sprint's business model is designed to recoup the almost

---

[3] Customers signing extended service agreements also agreed to early termination fees for cancellation of their wireless services prior to the end of the agreed-upon term of service. This fee was typically $150 at the time of the audit. The termination fee did not vary depending on how much a customer paid for their wireless phone.

3

"two billion dollars a year" that Sprint loses in phone sales through sales of wireless service plans. Administrative Report of Proceedings (ARP) at 15. Whalen further stated that Sprint sold most wireless phones at prices below their fair market value because "consumers in the U.S. aren't willing to pay a big upfront fee for [wireless phones], but they're more than willing to pay it over the life of a contract. So it's just more of a forced financing arrangement." ARP at 54. Whalen testified that despite losing money on nearly every phone Sprint sells, he does not "consider a cell phone to be a promotional item. The cell phone is integral to the business." ARP at 55.

DOR argued that contrary to Sprint's position, Sprint "distributed these cell phones without charge for a price of zero dollars and zero cents in order to promote the sale of its wireless service" and, in result, Sprint owed use taxes on the fully-discounted phones. ARP at 95. DOR also explained that because of the way Washington's tax statutes are written, it has a bright line rule: "[i]f you charge over zero dollars and zero cents, even if it's one dollar or one cent, then there's been a retail sale, and it's not use by the retailer. If you charge zero dollars and zero cents, it's use if it falls within this promotional purpose statute." ARP at 113-14.

On September 24, 2010, the Board delivered its written decision, concluding that Sprint did not owe use tax on the fully-discounted phones. DOR now appeals this decision.[4]

---

[4] DOR successfully appealed the Board's decision in Thurston County Superior Court. Although DOR prevailed at the trial court level, it is designated as the appellant in this action because it suffered the adverse agency action. *See, e.g., City of Federal Way v. Town & Country Real Estate, LLC*, 161 Wn. App. 17, 23, 252 P.3d 382 (2011) (citing General Order 2010-1 of Division Two, *In Re: Modified Procedures For Appeals Under The Administrative Procedures Act, Chapter 34.05, and Appeals Under the Land Use Petition Act, Chapter 36.70C RCW* (Wash. Ct. App.)). We review "the Board's decision, not the trial court's" and, accordingly, substantive discussion of the trial court's decision is unnecessary. *St. Joseph Gen. Hosp. v. Dep't of Revenue*, 158 Wn. App. 450, 458, 242 P.3d 897 (2010), *remanded*, 171 Wn.2d 1027 (2011).

No. 42304-9-II

DISCUSSION

FACTUAL FINDINGS

As a preliminary matter, DOR argues that a number of the Board's factual findings are not supported by evidence that is substantial when viewed in light of the whole record but "reviewing the Board's factual findings concerning Sprint's practice of providing free cell phones in certain transactions is complicated by the way the Board set forth those findings." Br. of Appellant at 23. While DOR is correct in arguing that the Board's findings fall short of the standard envisioned in RCW 34.05.461(3),[5] when "findings of fact are not explicitly delineated, or where those findings are buried or hidden within conclusions of law, it is within the prerogative of an appellate court to exercise its own authority in determining what facts have actually been found below." *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 406, 858 P.2d 494 (1993).

We exercise this authority to conclude that, contrary to the Board's assertions, (1) Sprint did not receive money *directly* from retail consumers for fully-discounted phones via customers' monthly service contract payments and, accordingly, Sprint did not sell fully-discounted phones in installment sales with a "zero down" payment; and (2) Sprint customers do not purchase wireless phones and wireless services as a single purchase.[6]

---

[5] RCW 34.05.461(3) states that "final orders shall include a statement of findings and conclusions, and the reasons and basis therefor, on all the material issues of fact, law, or discretion presented on the record."

[6] DOR also assigns error to the Board's conclusions that "[c]ell phones are 'not used to promote the business,'" AR at 84, and "Sprint is not a consumer of the 'free phones,' it is a retailer." AR at 97. Both of these findings are actually conclusions of law that we address below.

5

A.     STANDARD OF REVIEW

We may grant DOR relief by vacating some of the Board's findings if the Board's order is not supported by evidence that is substantial when viewed in the light of the whole record before the court. *See* RCW 34.05.570(3)(e). Substantial evidence is evidence that is sufficient to persuade a fair-minded person of the truth of the declared premise. *Heinmiller v. Dep't of Health*, 127 Wn.2d 595, 607, 903 P.2d 433, 909 P.2d 1294 (1995) (quoting *Nghiem v. State*, 73 Wn. App. 405, 412, 869 P.2d 1086 (1994)), *cert. denied*, 518 U.S. 1006 (1996). But we will overturn an agency's factual findings only if they are clearly erroneous and we are definitely and firmly convinced that a mistake has been made. *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 588, 90 P.3d 659 (2004). We review the evidence in the light most favorable to the party who prevailed in the highest administrative forum to exercise fact-finding authority, here Sprint. *City of University Place v. McGuire*, 144 Wn.2d 640, 652, 30 P.3d 453 (2001).

B.     INSTALLMENT SALE

In its sixth factual finding, the Board concluded that "Sprint receives money directly from the retail consumer for the 'free phones' via its monthly service contract payments and pays retail sales tax on that money." AR at 97. In addition, at the outset of its final decision, the Board states that the fully-discounted phones "were resold by Sprint in installments with a zero down payment, upon which sales tax was collected and paid to [DOR]." AR at 75. Our review of the record reveals that no evidence supports either of these findings.

First, the record reflects that customers' monthly wireless service fees do not vary depending on whether a customer received a fully- or partially-discounted phone or paid the full

retail price of the phone.[7] Second, customers received cash register receipts at the point of sale indicating that the fully-discounted phones were purchased for $0.00. The receipts do not indicate that customers will make further payments for the phones over time or that any further balance is owed on the wireless phones. Third, customers' monthly invoices for wireless service do not contain any charges for wireless phone purchases or give any indication that customers are still paying for phones they received for $0.00 at the point of sale. Fourth, Sprint's own expert, Whalen, agreed that Sprint's promotions for fully-discounted wireless phones did not involve "telling the customer come in and buy this [phone] over time." ARP at 67-68.

In light of this evidence, we agree with DOR that "Sprint did not offer any evidence showing customers actually purchased the free cell phones with payments over time because none existed." Reply Br. of Appellant at 5. The record does not reflect that Sprint sold fully-discounted phones as part of a legal installment sale. Indeed, retail installment contracts are governed by statute and must include, for instance, the item's sale price, the balance due on the item, and the schedule of payments. See RCW 63.14.040. None of the evidence in the record supports a finding that Sprint conducted installment sales for the fully-discounted phones it gave to customers.

C.    SEPARATE PURCHASES

The record also does not support the Board's finding that customers purchase wireless phones and wireless service as a single purchase. When purchasing wireless service, customers sign a "Sprint PCS Advantage Agreement," which includes the terms of the wireless service contract, activation fees for equipment, and potential early termination fees. AR at 1001. These

---

[7] Early termination fees for wireless service also do not vary depending on whether a customer receives a partial- or fully-discounted phone or pays full retail price for the device.

contracts do not, however, contain any specific information about the wireless phone a customer owns or has purchased. In addition, unlike the one-time sale of the wireless phone, Sprint sells wireless services on a monthly basis. Thus, a customer's wireless service contract with Sprint is actually a contract for a series of transactions (with each transaction producing a taxable event). *See, e.g., Gandy v. State*, 57 Wn.2d 690, 695, 359 P.2d 302 (1961). The record does not reflect that customers purchase wireless phones and wireless service as part of a single transaction.

To be clear, the record *does* reflect that Sprint priced its monthly wireless services at a rate intended to recoup the money it nearly always lost on selling partially- or fully-discounted wireless phones: Whalen testified that discounted phones represent "two billion dollars a year that we need to make up for in our service plans." ARP at 15. Nevertheless, selling wireless phones and selling monthly wireless services involve separate areas of taxation. Wireless service customers owe retail sales tax every month when purchasing telecommunications *services* from Sprint pursuant to RCW 82.04.050(5). At the point of sale, however, consumers owe a separate tax on *tangible personal property* (the wireless phone) pursuant to RCW 82.04.050(1). Although Sprint's business model is designed to treat the purchases together (i.e., Sprint prices its monthly services in a way to recoup losses from the sale of wireless phones), these purchases are separate for purposes of taxation. Accordingly, we conclude that Sprint customers do not purchase wireless phones and wireless service as a single purchase.

D.      RESULT

Although we acknowledge the Board's erroneous factual findings, a preliminary remand to correct the Board's findings is unnecessary. The core issue presented by this appeal—whether Sprint owed use tax on fully-discounted phones it gave to customers who signed long-term wireless service agreements—can be decided on undisputed facts stipulated to by the parties.

Thus, although some of the Board's factual determinations are clearly not supported by substantial evidence, our primary concern is whether substantial evidence supports the Board's *final decision* (rather than some of the Board's individual factual findings) and whether it involves erroneous interpretations of the law. RCW 34.05.570(3)(d)-(e). We conclude that the record does not contain substantial evidence supporting the Board's final decision and that the decision involves erroneous interpretations of the law.

USE TAX ASSESSMENT

DOR argues that under the use tax statutes, Sprint acted as a consumer when it gave some customers fully-discounted phones because, as in *Activate*, the fully-discounted phones were being given to customers primarily to promote the sale of wireless services. In the alternative, DOR argues that Sprint is liable for use tax because it did not resell the phones for valuable consideration (and was thus not a retailer of the phones) or, as in *Activate*, Sprint made intervening use of the phones before reselling them. Although Sprint received valuable consideration for the fully-discounted phones it sold customers, DOR is correct in arguing that this court's decision in *Activate* dictates the result here: as in *Activate*, Sprint gave away phones primarily to promote the sale of its wireless services or, alternatively, Sprint made intervening use of the phones. In either case, Sprint is liable for use tax.

A.  STANDARD OF REVIEW

On appeal, we review the Board's decision, not the decision of the superior court, and our review of the Board's decision is limited to the record before the Board. *Buechel v. Dep't of Ecology*, 125 Wn.2d 196, 202, 884 P.2d 910 (1994). The appealing party, DOR, bears the burden of demonstrating the invalidity of the Board's actions. *Pres. Our Islands v. Shorelines*

*Hearings Bd.*, 133 Wn. App. 503, 515, 137 P.3d 31 (2006), *review denied*, 162 Wn.2d 1008 (2008).

The Administrative Procedure Act (APA), ch. 34.05 RCW, governs our review of the Board's decision. *Stuewe v. Dep't of Revenue*, 98 Wn. App. 947, 949, 991 P.2d 634, *review denied*, 141 Wn.2d 1015 (2000). A party wishing to appeal an order from the Board may do so based on nine different grounds under RCW 34.05.570(3), including (d), erroneous interpretation or application of the law. Resolution of this dispute involves a question of statutory interpretation, which we review under the APA's error of law standard. *Olympic Stewardship Found. v. W. Wash. Growth Mgmt. Hearings Bd.*, 166 Wn. App. 172, 189, 274 P.3d 1040, *review denied*, 174 Wn.2d 1007 (2012). Under this standard, we accord substantial weight to DOR's interpretation of statutes it administers but, nevertheless, we are not bound by these interpretations if our de novo review reveals that DOR's interpretations are erroneous. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998) ("'[I]t is ultimately for the court to determine the purpose and meaning of statutes, even when the court's interpretation is contrary to that of the agency charged with carrying out the law.'" (quoting *Overton v. Econ. Assistance Auth.*, 96 Wn.2d 552, 555, 637 P.2d 652 (1981))).

When construing a statute, our objective is to ascertain and carry out the legislature's intent. *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). Statutory interpretation begins with the statute's plain meaning. *Lake*, 169 Wn.2d at 526. We discern the plain meaning from the ordinary meaning of the language at issue, the statute's context, related provisions, and the statutory scheme as a whole. *Lake*, 169 Wn.2d at 526. When faced with an unambiguous statute, we derive the legislature's intent from the plain language

alone. *Waste Mgmt. of Seattle, Inc. v. Util. & Transp. Comm'n*, 123 Wn.2d 621, 629, 869 P.2d 1034 (1994).

When a statute is ambiguous, however, we will "'resort to principles of statutory construction, legislative history, and relevant case law to assist in [its interpretation].'" *Yousoufian v. Office of King County Exec.*, 152 Wn.2d 421, 434, 98 P.3d 463 (2004) (quoting *State v. Watson*, 146 Wn.2d 947, 955, 51 P.3d 66 (2002)). A statute is ambiguous if it can be reasonably interpreted in more than one way. *Yousoufian*, 152 Wn.2d at 433-34 (quoting *Vashon Island Comm. for Self-Gov't v. Boundary Review Bd.*, 127 Wn.2d 759, 771, 903 P.2d 953 (1995)).

B.  BACKGROUND AND APPLICABLE STATUTES

Use tax is a companion tax imposed when a seller does not collect a retail sales tax. *See* RCW 82.12.020(1)(a); *Glen Park Assocs. LLC v. Dep't of Revenue*, 119 Wn. App. 481, 484 n.1, 82 P.3d 664 (2003), *review denied*, 152 Wn.2d 1016 (2004). The use tax's purpose is "to tax the privilege of using all tangible property within the state on which sales tax has not been paid." *Sacred Heart Med. Ctr. v. Dep't of Revenue*, 88 Wn. App. 632, 638, 946 P.2d 409 (1997). Importantly, "[a]n item of tangible personal property may not . . . be subject both to use tax and sales tax."[8] *Discount Tire Co. of Wash., Inc. v. Dep't of Revenue*, 121 Wn. App. 513, 521, 85 P.3d 400 (2004).

RCW 82.12.020(1) provides,

There is hereby levied and there shall be collected from every person in this state a tax or excise for the privilege of using within this state *as a consumer*: (a) Any article of tangible personal property purchased at retail, or acquired by lease, gift, repossession, or bailment, or extracted or produced or manufactured by the person

---

[8] The use tax rate is determined by the applicable retail sales tax rate. RCW 82.12.020(4).

so using the same, or otherwise furnished to a person engaged in any business taxable under RCW 82.04.280(2) or (7).

(Emphasis added.)

For most of the audit period, former RCW 82.12.010(2) (1994) defined the terms "use," "used," "using," and "put to use":

> [These terms] shall have their ordinary meaning, and shall mean the first act within this state by which the taxpayer takes or assumes dominion or control over the article of tangible personal property (*as a consumer*), and include installation, storage, withdrawal from storage, or any other act preparatory to subsequent actual use or consumption within this state.[9]

(Emphasis added.)

The Board has determined, and this court has agreed, that actual use of the property is not required and liability accrues when a consumer assumes dominion or control over tangible property it does not intend to resell. *Christensen v. Dep't of Revenue*, No. 49466, 1997 WL 235979 (Wash. Bd. of Tax Appeals, April 21, 1997) (cited with approval by *Seattle Filmworks, Inc. v. Dep't of Revenue*, 106 Wn. App. 448, 459, 24 P.3d 460, *review denied*, 145 Wn.2d 1009 (2001)). Whether use tax is applicable hinges on whether a party has used tangible personal property "as a consumer." RCW 82.12.010(6).

Three statutory provisions define the term "consumer" as applied in this context. DOR relies on two of these definitions in arguing that Sprint gave away free wireless phones as a consumer: RCW 82.12.010(6) and RCW 82.04.190(1)(a).[10]

---

[9] On June 1, 2002, the legislature added "distribution" to this list as a qualifying act of dominion and control. The 2002 version of the statute appears at RCW 82.12.010(3).

[10] DOR does not rely on RCW 82.04.190(2)(a).

C.    DISTRIBUTING PHONES PRIMARILY TO PROMOTE THE SALE OF WIRELESS SERVICES

RCW 82.12.010(6) provides,

"Consumer," in addition to the meaning ascribed to it in chapters 82.04 and 82.08 RCW insofar as applicable, shall also mean any person who distributes or displays, or causes to be distributed or displayed, any article of tangible personal property, except newspapers, the primary purpose of which is to promote the sale of products or services.

DOR argues that under this provision, Sprint is liable for use tax because it distributes fully-discounted wireless phones primarily for the purpose of promoting the sale of wireless services. Because Sprint sells *all* of its phones primarily to promote wireless service sales, and this court already decided this issue in *Activate*, a case with a near-identical fact pattern to the case currently before the court, we agree.

The *Activate* decision involved a company, Activate, who sold cellular telephones and related accessories from shopping mall kiosks. 150 Wn. App. at 810. Activate purchased wireless phones from AT&T suppliers and manufacturers in Oregon and did not pay Washington sales tax on these purchases. 150 Wn. App. at 810-11. DOR learned that "Activate had not resold all of the cellular phones it purchased; rather, it had given a portion of its inventory, without an additional or separate charge, to retail customers who agreed to sign an extended service agreement with AT&T." 150 Wn. App. at 811 (internal quotation marks omitted). Activate received a commission from AT&T for every extended cellular telephone agreement its customers entered into with AT&T. *Activate*, 150 Wn. App. at 810. As occurred here, Activate paid DOR's use tax assessment but appealed that assessment multiple times, ultimately to this court. *Activate*, 150 Wn. App. at 811.

In analyzing whether *Activate* acted as a consumer under RCW 82.12.010(6),[11] this court rejected the company's argument that it was not a consumer: "Activate distributes articles of tangible personal property (phones), the purpose of which is to promote the sale of products or services (AT&T service contracts); [Activate] is a 'consumer' under this provision." *Activate*, 150 Wn. App. at 816.

Here, Sprint attempts to distinguish between items it considers "promotional materials," describing these as "goods purchased by [the] business and given to customers, some are of little or no value to the customer—advertising materials, samples, etc.—and primarily of value to the business" and "goods that businesses purchase for resale to its customers and which do have real value to the customer." Br. of Resp't at 21-22. But the plain language of RCW 82.12.010(6) "does not restrict 'consumers' to persons that distribute items of little or no value to consumers (advertising brochures, etc.). It does not exclude 'core merchandise' or items a business might regularly sell."[12] Reply Br. of App. at 15. Because we derive the legislature's intent from the plain language alone when faced with an unambiguous statute, Sprint's argument fails. *Waste Mgmt. of Seattle*, 123 Wn.2d at 629. Wireless phones are tangible personal property and, as such, they fall within the purview of RCW 82.12.010(6).

---

[11] The *Activate* court cites to the 2006 version of the statute which has identical language but is codified at RCW 82.12.010(9). The current version of the statute codifies this language at RCW 82.12.010(1).

[12] Sprint also argues that DOR's own rule, WAC 458-20-17803(4), clarifies that promotional materials generally include low-value items like "advertising literature, circulars, catalogs, brochures . . . free gifts, or samples." The *Activate* court rejected this argument: "[I]f this rule were interpreted to limit [former RCW 82.12.010(6)] to its listed examples of 'promotional materials,' it would be inconsistent with the statute, in which case the rule would have to give way to the statute." 150 Wn. App. at 816 n.9.

Moreover, the record reflects that Sprint essentially sells *all* wireless phones—whether full price, partially discounted, or fully discounted—primarily for the purpose of persuading customers to join or remain connected to Sprint's wireless service network. This is simply the way the wireless service industry in the United States operates: "consumers in the U.S. aren't willing to pay a big upfront fee for [wireless phones], but they're more than willing to pay it over the life of a contract." ARP at 54. Whalen's testimony belies the notion that Sprint sells *any* wireless phones for purposes other than promoting its wireless service business.

As in the *Activate* case, Sprint was a consumer under the plain language of RCW 82.12.010(6) when it gave away fully-discounted phones primarily for the purpose of promoting its wireless services and, accordingly, is liable for use tax on these transactions.

D.     INTERVENING USE

RCW 82.04.190 provides,

"Consumer" means the following:
(1) Any person who purchases, acquires, owns, holds, or uses any article of tangible personal property irrespective of the nature of the person's business . . . other than for the purpose
(a) of resale as tangible personal property in the regular course of business.

In addition, RCW 82.04.050(1)(a) states that purchases made "for the purpose of resale as tangible personal property in the regular course of business" are exempt from regular taxation if the consumer has not made "intervening use" of the purchased items.

DOR argues, in the alternative, that Sprint should be liable for use tax under these provisions because Sprint did not receive valuable consideration for the fully-discounted phones it sold for $0.00 or Sprint made intervening use of the phones. Although Sprint did receive valuable consideration for the fully-discounted phones—wireless service contracts—we

conclude that, as in *Activate*, Sprint made intervening use of the phones and, accordingly, is liable for use tax under this provision.

In analyzing whether Activate qualified for the resale exemption from RCW 82.04.190(1)(a), this court reasoned that "Activate must show that (1) it purchased the property for resale (2) it resold the property in its regular course of business and (3) it did not use the property before the resale."[13] *Activate*, 150 Wn. App. at 817. After pointing out that RCW 82.04.040(1) defines the term "sale" as "any transfer of the ownership of, title to, or possession of property for a valuable consideration," this court concluded that Activate could not be said to have "resold" the phones it gave away for free because it failed "to cite to authority in support of its contention that consideration need not come directly from the retail customer or that a customer's promise to enter into a service agreement with a third party meets the *statutory* definition of 'valuable consideration' under RCW 82.04.040(1)." *Activate*, 150 Wn. App. at 818.

Unlike in *Activate*, this case does not involve a situation where valuable consideration involves a third party. Instead, Sprint *itself* receives valuable consideration for the fully-discounted phones it "sells" to customers. Accordingly, *Activate* differs on that point and DOR is incorrect in asserting that, under *Activate*, Sprint owes use tax on sale of the fully-discounted phones because it did not receive valuable consideration during the sale. Here, the undisputed material facts reflect that Sprint provided fully-discounted phones only to customers who were willing to sign long-term service agreements. As Whalen testified, this meant that in exchange for a fully-discounted wireless phone, a customer would agree to contractual obligations involving monthly service fees and potential termination fees amounting to "$1,400 worth of

---

[13] This "intervening use" requirement stems from the interplay of RCW 82.04.050(1)(a) with RCW 82.04.190(1)(a).

16

stuff." ARP at 68. Accordingly, Sprint received valuable consideration in exchange for these fully-discounted phones.

Nevertheless, Sprint's argument fails under a different conclusion reached by the *Activate* court: if a party makes intervening use of tangible personal property it intends on "reselling" at no cost, it does not qualify for the resale exemption from RCW 82.04.190(1)(a). 150 Wn. App. at 818-19 ("Activate made intervening use of these phones by using them as part of the marketing promotion to attract consumer business."). The *Activate* court summarized this conclusion by stating that Activate used the fully-discounted phones it gave to customers "to its benefit and in a way that was useful to them—it ultimately used [the phones] to promote, through advertising, service agreements with AT&T." 150 Wn. App. at 822-23. The material facts of this case do not differ on this point.

Here, Sprint made intervening use of the phones it ultimately "sold" for no money (but valuable consideration) because the phones served the marketing purpose of convincing customers to purchase wireless service contracts. Accordingly, *Activate* is indistinguishable on this point and Sprint is liable for use tax pursuant to RCW 82.04.190(1)(a).

CONCLUSION

Under either RCW 82.04.190(1)(a) or RCW 82.12.010(6), Sprint is a consumer of the fully-discounted phones it eventually "sells" to customers for $0.00. As such, Sprint is liable for

use tax on this tangible personal property under RCW 82.12.020(1). Accordingly, we vacate the

Board's order and remand for further proceedings consistent with this opinion.[14]

QUINN-BRINTNALL, J.

We concur:

VAN DEREN, J.

WORSWICK, C.J.

_____

[14] We are aware that on the surface, this result defies common sense: had Sprint charged a penny for the phones it provided customers in exchange for signing long-term service agreements, no use tax would apply. But the specifics of the taxation process are a legislative concern. If the legislature desired a different result, it could structure the tax code differently.

Moreover, Washington's tax code has benefits: unlike in some states, Washington does not impose taxes on discounted phones equal to their normal retail sales price. Thus, if Sprint sells a $100 phone for $1, retail sales tax is owed only on the $1. In contrast, under California's tax regulations, those phone retailers would collect sales tax on $100—the normal retail sales price of the discounted or free phones. *Bower v. AT&T Mobility, LLC*, 196 Cal. App. 4th 1545, 1553, 127 Cal. Rptr. 3d 569 (2011). Here, DOR does not argue that Sprint should pay taxes on the normal retail sales price of phones it has sold at discounted rates. Instead, DOR asserts that when Sprint discounts phones to the point that they are giving them away free, the legislatively-created provisions of Washington's use tax are triggered, and Sprint must pay use tax as a consumer of those phones.