[No. 37958-5-I.   Division One.   June 16, 1997.]

US WEST COMMUNICATIONS, INC., *Appellant*, v. THE UTILITIES AND TRANSPORTATION COMMISSION, ET AL., *Respondents*.

*Lisa A. Anderl* and *Edward T. Shaw,* for appellant.

*Christine O. Gregoire, Attorney General,* and *Shannon E. Smith, Assistant,* for respondent Washington Utilities and Transportation Commission.

*Arthur A. Butler, Stephen J. Kennedy,* and *Ater, Wynne, Hewitt, Dodson & Skerrit,* for respondent Electric Lightwave, Inc.

*Gregory J. Kopta* and *Davis Wright Tremaine,* for respondent TCG Seattle.

ELLINGTON, J. — US West Communications, Inc. (US West) challenges an order of the Washington Utilities and Transportation Commission (the Commission) classifying two companies as competitive telecommunications companies. At issue is the proper construction of the phrase "significant captive customer base" as it is used in the definition of effective competition, which is the determining factor in deciding whether a telecommunications company is entitled to competitive classification. We agree with the Commission and the respondent companies that the determination of whether a telecommunications company has a significant captive customer base is to be made by examining the company's end use, retail customers. We also agree with the Commission that the customers of the two respondent companies have reasonably available alternatives and that the companies therefore do not have signif-

icant captive customer bases and were properly granted competitive classification.

## FACTS

In 1994, Respondents Electric Lightwave, Inc. (ELI) and TCG Seattle (TCG) petitioned the Commission for classification as competitive telecommunications companies pursuant to RCW 80.36.320(1). US West petitioned to intervene in both proceedings and Washington Independent Telephone Association (WITA) petitioned to intervene in the proceedings regarding TCG's petition.

On January 11, 1995, the Commission granted ELI's petition for competitive classification, and on June 30, 1995, it granted TCG's petition. US West filed petitions for review of both orders in superior court and WITA filed a petition for review of TCG's order. The trial court affirmed the Commission's order granting the two companies competitive classification. US West appeals.[1]

## DISCUSSION

A. Standard of Review.

█ █ Under the Washington Administrative Procedure Act, a reviewing court may reverse an agency decision "when, *inter alia*, (1) the administrative decision is based on an error of law; (2) the decision is not based on substantial evidence; or (3) the decision is arbitrary or capricious." *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). In reviewing an administrative decision, the appellate court sits in the same position as the superior court and applies the standards of the Act directly to the record before the agency. *Tapper*, 122 Wn.2d at 402.

█ █ In the present case, the parties dispute the Com-

---

[1]Initially, Washington Independent Telephone Association was an appellant along with US West. However, in June, 1996, this court granted WITA's motion to withdraw its appeal.

mission's interpretation of the competitive classification statute. "Construction of a statute is a question of law which we review de novo under the error of law standard." *Waste Management of Seattle, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 621, 627, 869 P.2d 1034 (1994). If the statute at issue is ambiguous, the agency's interpretation of the statute is accorded great weight in determining legislative intent. *Waste Management*, 123 Wn.2d at 628. However, absent ambiguity, there is no need for an agency's expertise in construing the statute. *Waste Management*, 123 Wn.2d at 628.

B. Relevant Statutes.

TCG and ELI filed for competitive classification under RCW 80.36.310, which allows telecommunications companies to petition to be classified as competitive under RCW 80.36.320. RCW 80.36.320 provides in pertinent part:

> The commission shall classify a telecommunications company providing service in a relevant market as a competitive telecommunications company if it finds, after notice and hearing, that the telecommunications company has demonstrated that the services it offers are subject to effective competition. Effective competition means that the company's customers have reasonably available alternatives and that the company does not have a significant captive customer base. In determining whether a company is competitive, factors the commission shall consider include but are not limited to:
>
> (a) The number and sizes of alternative providers of service;
>
> (b) The extent to which services are available from alternative providers in the relevant market;
>
> (c) The ability of alternative providers to make functionally equivalent or substitute services readily available at competitive rates, terms, and conditions; and
>
> (d) Other indicators of market power which may include market share, growth in market share, ease of entry, and the affiliation of providers of services.

The attractiveness of competitive status is that competitive telecommunications companies are subject to "minimal regulation" and "may file, instead of tariffs, price lists which shall be effective after ten days' notice to the commission and customers." RCW 80.36.320(2). Also, the Commission may waive other regulatory requirements for such companies when it determines that competition will serve the same purposes as public interest regulation. RCW 80.36.320(2).

The burden lies with the applicant to demonstrate that it faces effective competition in the relevant market. *Electric Lightwave, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 530, 547, 869 P.2d 1045 (1994).

C. Overview of Telecommunications Companies and Services.

The structure for telephone service in Washington, as modified after the breakup of the American Telephone and Telegraph Company, was described by the court in *Washington Indep. Tel. Ass'n v. Telecomm. Ratepayers Ass'n for Cost-Based & Equitable Rates (TRACER)*, 75 Wn. App. 356, 880 P.2d 50 (1994), as follows:

> The basic unit of [telephone service in Washington state] is the exchange. An exchange, as determined by the Commission, is "a unit established by a utility for communication service in a specific geographic area, which unit usually embraces a city, town or community and its environs." There are approximately 300 exchanges in Washington State.
>
> Each exchange is served by a local exchange company (LEC), which provides a range [of t]elecommunications service within each exchange. Such service includes "access service", which enables a local customer to connect with other exchanges. It also includes local calls, *i.e.*, calls that originate and terminate within the same exchange. A local call is charged on a flat rate basis and is billed to a customer on the "monthly bill".

Interexchange companies provide service between exchanges. Some interexchange companies, such as AT&T, MCI Telecommunications Corporation, and US Sprint provide service between various Local Access and Transport Areas (LATA's), which are larger geographic areas consisting of many exchanges, roughly coinciding with area codes. These interexchange companies may also compete in providing *intra*LATA, interexchange service. Other companies provide only intraLATA service. For instance, US WEST Communications, Inc. (US WEST), a former Bell Operating Company which is also an LEC, is authorized by the Commission to provide interexchange, intraLATA service in most of Western Washington.

When a telephone call is placed between two different exchanges (an interexchange call), regardless of whether it is intraLATA or interLATA, it is generally considered a "toll" call, for which the customer originating the call is charged a fee based on usage. When a "toll" call is placed between exchanges, the interexchange company that carries the call (regardless of whether the call is interLATA or intraLATA) must use the access services of LEC's. In return for the use of an LEC's access services, the interexchange company compensates the LEC (both the originating and terminating end if the LEC's are different) with access charges.

75 Wn. App. at 358-59 (footnotes omitted).

ELI and TCG are telecommunications companies authorized to provide both intraexchange (local) and interexchange (long distance) services.

D. The Commission's Findings.

The Commission found that ELI and TCG

clearly [have] no market power whatsoever, other than any advantage that may be gained by efficient provision of competitive services through innovation in technology and network operations. Until the minimum prerequisites for local exchange competition have been addressed by US WEST, it is unlikely that [ELI's or TCG's] status as a competitive company will change.

(Footnote omitted).

In its findings of fact, the Commission found that all services offered by ELI and TCG are fully available from alternative providers such as US West and GTE Northwest, that neither ELI nor TCG has a captive customer base, and that the services offered by ELI and TCG are subject to effective competition. Thus, the Commission concluded that ELI and TCG are entitled to competitive classification.

E. The Parties' Contentions.

The issues presented in this appeal relate to ELI's and TCG's provision of access service. US West does not dispute the fact that neither ELI nor TCG has captive, end use, retail customers. Rather, US West claims that ELI and TCG should be denied competitive classification because they have captive customer bases comprised of those carriers whose customers make calls to customers of ELI or TCG and thereby force the carrier to use ELI's or TCG's access service.[2] US West claims that by granting ELI and TCG competitive status, the Commission erroneously interpreted the term "customer" to mean retail or end use customers, and erroneously interpreted the term "service" to exclude access services.

The Commission, on the other hand, takes the position that the legislative intent in enacting RCW 80.36.320 was to protect "ratepayers" or end use customers, not other carriers, and that the proper inquiry is whether ELI's or TCG's end use customers are captives of the companies. Because neither ELI nor TCG has any market power to speak of, the Commission claims that neither company can hold their end use customers captive and that therefore, they likewise cannot hold US West or other interexchange companies captive.

---

[2]For example, if a US West customer calls the telephone number assigned to an ELI customer, US West must, in order to complete the call, interconnect with ELI's switch, because only ELI can route the call on to the telephone line of the customer assigned to that number.

ELI also argues that the critical question is whether it has a captive base of end use customers, because if it does not, then it cannot possibly have a captive base of interexchange companies. ELI claims that since US West has nearly a 100 percent market share of local customers in its service territory, and since ELI's customers will need to connect with US West's customers, ELI is restrained by economic realities from exerting any unreasonable market power over US West that would jeopardize its business relationship with US West.

Similarly, TCG claims that the Commission properly focused on the impact of TCG's and ELI's provision of services on the end use customer because it is this end use customer who ultimately pays for and receives the companies' services. TCG also claims that carriers alone cannot constitute a "significant captive customer base," but rather that a local exchange company's foundation is its end use subscribers, not other carriers, so the subscribers constitute the customer "base" for purposes of competitive classification.

F. Construction of RCW 80.36.320.

■■ The phrase "significant captive customer base" as used in RCW 80.36.320 is subject to two or more reasonable interpretations, as evidenced by the parties' arguments. Thus, the statute is ambiguous. *See State v. McGee*, 122 Wn.2d 783, 787, 864 P.2d 912 (1983). If statutory language is ambiguous, we resort to a dictionary, *National Fed'n of Retired Persons v. Insurance Comm'r*, 120 Wn.2d 101, 112, 838 P.2d 680 (1992), or the statute's legislative history, *King v. Riveland*, 125 Wn.2d 500, 510, 886 P.2d 160 (1994), to determine the proper interpretation.

The dictionary definition of "customer" is not helpful. The term is defined as "[o]ne who regularly or repeatedly makes purchases of, or has business dealings with, a tradesman or business." BLACK'S LAW DICTIONARY 348 (5th ed. 1979). Under this definition, both end use custom-

ers and carriers such as US West could be deemed customers of ELI and TCG.

██ ██ The legislative history of RCW 80.36.320 manifests a legislative intent to protect the ratepayers. The report of the Joint Select Committee on Telecommunications contains the following statement: "A major threat to the development of effective competition is the remaining presence of a 'captive' customer base *consisting of ratepayers who have no choice of service providers.*" (Emphasis added.) The report of the House Committee on Energy and Utilities states that the Committee recommended retaining "the monopoly ratepayer" as the focus of regulation. Thus, the Legislature intended that decisions regarding the competitive classification of telecommunications companies be made after analyzing the impact of the decision on the ratepayer. Consistent with this legislative intent, it follows that the "customer" to which the competitive classification statute refers is the ratepayer, that is, the end use customer, and not the carriers which use the company's access service.

Although we review questions of law de novo, we accord an agency's legal conclusion substantial weight where, as here, the issue falls within the agency's expertise, *Johnson v. Employment Sec. Dep't*, 64 Wn. App. 311, 316, 824 P.2d 505 (1992), and the statute is ambiguous. *Waste Management of Seattle, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 621, 628, 869 P.2d 1034 (1994). The Commission determined that end use customers were the entities upon which to focus in deciding whether ELI or TCG had a captive customer base. The Commission reasoned that if ELI and TCG were able to exercise market power over companies such as US West who purchase access from them, they would also be exercising market power over their own end use customers. Because neither ELI nor TCG has anything but a minuscule share of the market, however, neither company has any market power over its end use customers. Therefore, the Commission concluded that since none of ELI's or TCG's end use

customers is captive, the companies cannot hold US West or any other carrier captive. The Commission's determination is entitled to substantial deference, as it is not only a determination within the agency's expertise, but also is consistent with the legislative intent behind the competitive classification statute.

US West points to a prior Commission decision as inconsistent with the Commission's position here. *In re AT&T Communications of the Pac. N.W., Inc.*, 85 Pub. Utils. Reports 304 (June 5, 1987) involved AT&T's petition for competitive classification in the interLATA interexchange telecommunications market. In its analysis of whether AT&T was subject to effective competition, the Commission found that the absence of a significant captive customer base was a major factor in its analysis. The Commission stated: "AT&T does not provide 'bottleneck' service, i.e. access. Competing carriers do not have to go to AT&T to buy essential local exchange connections. AT&T is not affiliated with a local exchange monopoly company." *In re: AT&T*, 85 Pub. Utils. Reports at 318.

US West asserts the quoted language represents the Commission's holding that a company cannot be competitive if it provides access service. We disagree. The Commission's focus was not on whether a company providing local access service such as ELI or TCG could be classified as competitive, because AT&T, unlike ELI and TCG, did not provide access service. Thus, the Commission was not presented with this issue and the statements to which US West refers cannot fairly be characterized as a "holding" with respect to this issue.

US West next asserts that granting ELI and TCG competitive status would allow these companies to have a monopoly on access service and charge exorbitant rates to carriers such as US West. Again, we disagree. Given the companies' lack of market power and initial zero percent market share, ELI and TCG have every incentive not to jeopardize their relationships with US West, which has nearly 100 percent of the market share for local service

within its territory. Given the dominance of US West, preservation of access to US West customers will be critical for ELI and TCG, whose customers would otherwise only be able to call each other. The likelihood that ELI or TCG would charge exorbitant rates to US West for access services is therefore nonexistent. And should one of these small companies surprise observers by doing so, resort to the Commission is always available. As the Commission's staff stated, if US West and ELI or TCG

> are unable to negotiate satisfactory interconnection and/or compensation arrangements for exchange of traffic, then either of them can file a complaint and the Commission can select among a variety of available remedies: The Commission can reclassify [ELI or TCG] as a non-competitive telecommunications company, or [t]he Commission can upon complaint order [ELI or TCG] to file a satisfactory tariff.

For the foregoing reasons, we conclude that the customers to which RCW 80.36.320 refers are the end users of a local exchange company's services. We also conclude that neither ELI nor TCG has a captive customer base because their customers have reasonably available alternatives. Thus, we affirm the Commission's order classifying ELI and TCG as competitive.

G. Findings of the Commission.

Finally, US West argues that the Commission's final orders do not contain adequate findings and conclusions as required by RCW 34.05.461(3). US West's argument relating to this assignment of error is contained in a footnote in its brief, and consists in its entirety of the following:

> The ELI Order is legally deficient since it does not contain sufficiently explained findings and conclusions as required by RCW 34.05.461(3). *See State Ex rel. Pet. Transp. v. P.S.C.*, 35 Wn.2d 858, 216 P.2d 177 (1950). The same can be said of the TCG Order, although it at least summarily addresses in part the legal issues raised by [US West].

Assuming this summary contention is sufficient to raise

an issue on appeal, lodged as it is only in a footnote and unsupported by any statement of reasons why the orders are deficient, we reject it.

RCW 34.05.461(3) provides:

> Initial and final orders shall include a statement of findings and conclusions, and the reasons and basis therefor, on all the material issues of fact, law, or discretion presented on the record, including the remedy or sanction and, if applicable, the action taken on a petition for a stay of effectiveness. Any findings based substantially on credibility of evidence or demeanor of witnesses shall be so identified. Findings set forth in language that is essentially a repetition or paraphrase of the relevant provision of law shall be accompanied by a concise and explicit statement of the underlying evidence of record to support the findings. The order shall also include a statement of the available procedures and time limits for seeking reconsideration or other administrative relief. An initial order shall include a statement of any circumstances under which the initial order, without further notice, may become a final order.

Notably, the statute does not require that findings and conclusions contain an extensive analysis.

Both the Commission's orders from which US West appeals contain statements of findings and conclusions. Contrary to US West's claim, the orders do contain the reasons for the Commission's findings and conclusions, including its reasons for rejecting US West's arguments. In both orders, the Commission states that it agrees with its staff's interpretation of RCW 80.36.320 over US West's because it found the "Staff's analysis of the issues posited by the ELI petition to more closely comport with actual experience to date of the telecommunications industry in the state," and it found "the interpretation and analysis of both Commission Staff and TCG to be more relevant to the issues posited by the TCG petition, and to more closely comport with our view of legislative intent and actual experience to date of the telecommunications industry in this state." Adequacy, not eloquence, is the test. US West

fails to explain why these statements are insufficient under RCW 34.05.461(3), and we fail to discern any such reason. The findings and conclusions comply with the statutory requirements and will not be disturbed.

Affirmed.

AGID and Cox, JJ., concur.