FILED
COURT OF APPEALS
DIVISION II

2014 FEB 20 AM 9: 25

STATE OF WASHINGTON

BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| LLOYD V.E. OLSON, M.D., | No. 43552-7-II |
| Petitioner, | |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF HEALTH MEDICAL QUALITY ASSURANCE COMMISSION, an agency of the State of Washington, | UNPUBLISHED OPINION |
| Respondent. | |

JOHANSON, A.C.J. — Dr. Lloyd Olson appeals the State Department of Health Medical Quality Assurance Commission's (Commission) final order suspending his medical license for unprofessional conduct. Dr. Olson argues that (1) the Commission erred by failing to enter findings as to all material facts and credibility determinations; (2) the Commission's "charge first, ask questions second" policy deprived him of due process (Br. of Appellant at 41); and (3) the Commission's unprofessional conduct conclusions misapplied the law and are unsupported by factual findings. In addition, he assigns error to several findings of fact. Because Dr. Olson does not show that the Commission entered insufficient findings regarding material facts or witness credibility, deprived him of due process or misapplied the law, and because the challenged findings are supported by substantial evidence, we affirm.

FACTS

SUBSTANTIVE FACTS

In April 2010, Dr. Olson was an anesthesiologist working for Premier Anesthesia group and providing anesthesia services[1] in Richland, Washington.[2] On April 1, 2010, Dr. John Droesch performed four surgeries and Dr. Olson was the anesthesiologist for these surgeries. Jamie Lyn Roy was Dr. Droesch's surgical technician assistant. Dr. Droesch's second surgery of the day was on Patient A and his fourth surgery of the day was on Patient B.[3]

In the operating room, after Dr. Olson put Patient A under anesthetic to prepare her for surgery, Roy was standing at the foot of Patient A's operating bed while waiting for the surgery to begin. Roy heard Dr. Olson say, "'I wonder if this patient has breast implants.'" 6 Administrative Record (AR) at 3197. Roy then saw Dr. Olson reach forward with both hands to grab each of Patient A's breasts in each of his hands and start to "fondle her breasts inappropriately" for a minute and a half to two minutes. 6 AR at 3197. Later that day, Roy saw Dr. Olson touch Patient B in a similar way. Patient B was also scheduled to have surgery on her chest area, and it was apparent that she had breast implants. After Dr. Olson put Patient B under anesthetic, Roy was standing at the foot of Patient B's operating bed and heard Dr. Olson say that Patient B had breast implants and then she saw him reach down with both hands and grab

---

[1] An anesthesiologist is a physician who administers anesthetic agents to patients to cause partial or complete loss of consciousness during surgical procedures.

[2] Some facts come from unchallenged findings of fact from the Commission's findings of fact, conclusions of law, and final order. Unchallenged findings are verities on appeal. *Hilltop Terrace Homeowner's Ass'n v. Island County*, 126 Wn.2d 22, 30, 891 P.2d 29 (1995).

[3] The Commission used "Patient A" and "Patient B" for confidentiality purposes. We do the same.

each of Patient B's breasts in each hand and cup and massage her breasts for a minute to two minutes. Each time, Roy was shocked but did not know what to do.

The next day, Roy assisted in surgeries for Dr. Alexander Ortolano and Dr. Richard Lorenzo, and Dr. Olson was the anesthesiologist. The doctors were performing vaginal surgeries on two patients and during each of the surgeries, Roy saw Dr. Olson come to the foot of the operating table and watch the surgeries. Roy felt that the approximately 10 minutes that he spent watching was inappropriate and "creepy" for an anesthesiologist to do. 6 AR at 3238. That day, Roy told another anesthesiologist, Dr. Robin Kloth, about Dr. Olson's unprofessional conduct. Dr. Kloth then reported the allegations to her supervisors at Premier who contacted Dr. Olson. Dr. Olson admitted that he had touched the patients' breasts to determine if they had breast implants. Dr. Olson later resigned his position in lieu of termination.

THE COMMISSION'S INVESTIGATION AND ADJUDICATION

Dr. Droesch told Patient A and Patient B about the allegations. Patient A reported the allegations to the Richland Police Department who assigned Detective Roy Shepherd to investigate the case. Dr. Olson admitted to Detective Shepherd that he had touched the patients because he was a physician entitled to examine the patients. Detective Shepherd reported the allegations to the Commission who assigned Denise Gruchalla to investigate. She reviewed Roy's complaint, the patients' medical records, interviewed the parties involved, and submitted her findings to the Commission.

In May 2010, the Commission issued its statement of charges, and ex parte order of summary suspension to Dr. Olson, alleging that he violated RCW 18.130.180(1), (7), (24), and WAC 246-919-630(2)(e) and finding that he posed a danger to any patients under his care. Dr. Olson answered the allegations, requested a show cause hearing and prompt adjudicative

hearing, and filed a declaration denying any inappropriate conduct and asserting that he had touched the patients' upper chest wall to confirm whether they had breast implants out of concern for their identities. On May 25, the Commission held a show cause hearing and confirmed its earlier decision that Dr. Olson was an immediate threat to the public health, safety, or welfare and left its suspension in place.

In July, a full hearing was held in front of a health law judge (HLJ) and members of the Commission's panel. The HLJ heard testimony from Roy, another nurse, Detective Shepherd, Gruchalla, Kadlec management personnel, and other doctors including Dr. Kloth, Dr. Droesch, Dr. Olson,[4] Dr. Dheeraj Ahuja, Dr. Scott Kennard (as an expert witness), and another expert witness called by Dr. Olson. In September, the Commission entered its findings of fact, conclusions of law, and final order. The Commission determined that the State had proved with clear and convincing evidence that Dr. Olson committed unprofessional conduct under RCW 18.130.180(7), (24), and WAC 246-919-630(2). The Commission imposed Tier B sanctions under WAC 246-16-820 and WAC 246-16-830 because Dr. Olson had no appropriate examination or treatment reason to touch the patients' breasts and because his conduct was "forceful contact," since the patients were each under anesthesia, unconscious, and unable to give informed consent. Clerk's Papers (CP) at 282. The Commission ordered that Dr. Olson's license remain suspended but that he could apply for reinstatement after participating in educational programs and evaluations.

---

[4] In addition to denying misconduct and asserting that he touched the patients to confirm their identities, Dr. Olson testified that there was a Patient 3, who was having a mastectomy surgery on the same day as Patient A's and Patient B's surgeries and that he had confused Patient 3 with Patient A when he had previously admitted to touching her chest area.

No. 43552-7-II

Dr. Olson moved the HLJ for reconsideration, which was denied. He also petitioned the superior court for review and the superior court affirmed the Commission. Dr. Olson appeals.

## DISCUSSION

### STANDARD OF REVIEW

The Uniform Disciplinary Act (Act), chapter 18.130 RCW, was enacted to "assure the public of the adequacy of professional competence and conduct in the healing arts." RCW 18.130.010. The Washington Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of disciplinary proceedings under the Act. RCW 18.130.100. As the party challenging the Commission's decision, Dr. Olson bears the burden of establishing the decision is invalid under one or more of the APA criteria.[5] RCW 34.05.570(1)(a). On review, we sit in the same position as the superior court and apply the APA standards directly to the record before the agency. *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993).

Under RCW 35.05.570(3), we will reverse only (1) if we determine the administrative decision is based on an error of law, (2) if we determine the administrative decision is unsupported by substantial evidence, (3) if we determine the administrative decision is arbitrary or capricious, (4) if we determine the administrative decision violates the constitution, (5) if we determine the administrative decision is beyond statutory authority, (6) when the agency

---

[5] Dr. Olson argues that we should review the Commission's findings under a "highly probable" standard to ensure that clear, cogent, and convincing evidence support them. But Dr. Olson seems to confuse the standard of proof at the agency level with our standard of review on appeal. Dr. Olson is correct that the Supreme Court in *Bang D. Nguyen v. Department of Health, Medical Quality Assurance Commission*, 144 Wn.2d 516, 518, 29 P.3d 689 (2001), *cert. denied,* 535 U.S. 904 (2002), required the clear, cogent, and convincing standard of proof for the agency, and here that is clearly the standard that the Commission applied, but *Nguyen* did not address the standard of appellate review, which is established by the APA.

employs improper procedures, (7) when the agency has not decided all issues requiring resolution, (8) when a motion for disqualification should have been granted, or (9) when the order is outside the agency's statutory authority.[6] *Tapper*, 122 Wn.2d at 402. We review conclusions of law de novo. *Haley v. Med. Disciplinary Bd.*, 117 Wn.2d 720, 730, 818 P.2d 1062 (1991). But we accord substantial weight to an agency's interpretation of the law it administers when it is within the agency's expertise. *Haley*, 117 Wn.2d at 728.

The Commission may rely on its experience and specialized knowledge to evaluate the evidence when finding unprofessional conduct. RCW 34.05.452(5); WAC 246-11-160(2); *In re Discipline of Brown*, 94 Wn. App. 7, 13-14, 972 P.2d 101 (1998), *review denied*, 138 Wn.2d 1010 (1999). We will not weigh conflicting evidence or substitute our judgment regarding witness credibility for that of the Commission. *Davis v. Dep't of Labor & Indus.*, 94 Wn.2d 119, 124, 615 P.2d 1279 (1980). A medical disciplinary proceeding is considered quasi-criminal, so the standard of proof at the agency level is that findings of fact must be proved by clear, cogent, and convincing evidence below. *Bang D. Nguyen v. Dep't of Health, Med. Quality Assurance Comm'n*, 144 Wn.2d 516, 529, 29 P.3d 689 (2001), *cert. denied*, 535 U.S. 904 (2002). But on appeal, we review the Commission's findings of fact like any other proceeding under the APA for substantial evidence. *Ancier v. Dep't of Health, Med. Quality Assurance Comm'n*, 140 Wn. App. 564, 572, 166 P.3d 829 (2007). We will determine the evidence is substantial when it is sufficient to persuade a reasonable person of the truth or correctness of the order. *Ancier*, 140

---

[6] Here, citing RCW 34.05.570(3), Dr. Olson asserts that (1) the Commission's order violates constitutional provisions on its face or as applied; (2) the Commission has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure; (3) the Commission has erroneously interpreted or applied the law; (4) the order is not supported by substantial evidence when viewed in light of the whole record; (5) the Commission has not decided all issues requiring resolution; and (6) the order is arbitrary and capricious.

Wn. App. at 572-73. We take the Commission's evidence as true and draw all inferences in the Commission's favor. *Ancier*, 140 Wn. App. at 573. Unchallenged agency factual findings are verities on appeal. *Hilltop Terrace Homeowner's Ass'n v. Island County*, 126 Wn.2d 22, 30, 891 P.2d 29 (1995). After determining whether substantial evidence supports findings of fact, we determine whether the findings in turn support the conclusions of law and judgment. *Nguyen*, 144 Wn.2d at 530.

CHALLENGED FINDINGS OF FACT

Dr. Olson challenges several findings of fact. All of the findings he challenges are supported by substantial evidence. Findings of fact 1.17, 1.25, and 1.26 are partially supported by unchallenged findings of fact, which are verities on appeal. *Hilltop Terrace*, 126 Wn.2d at 30. The remaining challenged findings are supported by testimony, deposition testimony, and other record filings.

1. ROY'S TESTIMONY

Findings of fact 1.13, 1.17, 1.22, 1.24, 1.26, and 1.32 are supported by Roy's testimony. These findings relate to Dr. Olson's touching of Patient A and Patient B on April 1, 2010, that Dr. Olson did not raise any question regarding either patient's identity during the time-out process prior to their surgeries, and Dr. Olson's prolonged viewing of the two vaginal surgeries on April 2, 2010. The Commission found Roy's testimony credible and we will not disturb that finding. Roy assisted on Patient A's mediport surgery on April 1, 2010, as the surgical technician and Dr. Olson was the anesthesiologist. After Patient A was asleep, she stood at the foot of Patient A's bed with an unobstructed view of Dr. Olson when she heard him say, "'I wonder if this patient has breast implants.'" 6 AR at 3197. Then she saw him reach with both

7

hands to grab each of Patient A's breasts and start to "fondle her breasts inappropriately" for a minute and a half to two minutes. 6 AR at 3197.

She also testified about Patient B, including that Patient B had breast implants; she assisted in Patient B's wire localized biopsy procedure; she had an unobstructed view of Patient B laying on the operating table; and she saw Dr. Olson reach down to place each of his hands over each of Patient B's breasts and touch her breasts in a massaging motion for one to two minutes.

And on April 2, 2010, she again assisted in surgeries where Dr. Olson was the anesthesiologist on two patients having vaginal surgeries. Dr. Olson came to the foot of the operating table, stood next to Roy, and watched the surgeries. Roy felt that the approximately 10 minutes that he spent watching was inappropriate and "creepy." 6 AR at 3238. She reported Dr. Olson's conduct to Dr. Kloth that day. Roy also testified about the time-out process to check a patient's identity before moving forward with surgery.

### 2. DETECTIVE'S SHEPHERD'S AND DETECTIVE HANSENS'S TESTIMONY

Detective Shepherd's and Detective John Hansens's testimony support challenged finding of fact 1.14, which relates to Dr. Olson's admission to Detective Shepherd that he touched Patient A's breasts to confirm her identity. Detective Shepherd interviewed Dr. Olson by phone, he put Dr. Olson on speakerphone, and Detective Hansens overheard part of the conversation. Dr. Olson told Detective Shepherd that he touched the patients because he was a physician entitled to do his own examination and that he did so out of curiosity.

### 3. DR. OLSON'S DECLARATION AND TESTIMONY

Dr. Olson's declaration to the Commission supports findings of fact 1.14, 1.17, 1.24, and 1.25. These findings relate to his touching of Patient A, his admission to Detective Shepherd

that he touched Patient A, that he did not raise the issue of Patient A's identity during the time-out process prior to her surgery, that he touched Patient B's breasts, and that there was no medical reason for him to do so. In his declaration, he admitted that he pressed on Patient A's and Patient B's upper chest to determine if they had breast implants and to confirm their identities. He also later testified about a Patient 3 that he had confused with Patient A, that he did not raise any questions with Patient A about her identity, and that he touched Patient B. The Commission used its experience and specialized knowledge to determine that the touching that Dr. Olson admitted to would not have made it possible to determine whether Patient B had subpectoral breast implants. *Brown*, 94 Wn. App. at 13-14. Thus, the Commission determined that part of Dr. Olson's testimony was not credible and we will not disturb that finding.

4. DR. KENNARD'S TESTIMONY

Dr. Kennard's testimony supports challenged findings of fact 1.16, 1.17, 1.24, 1.25, and 1.26. These findings relate to the fact that Dr. Olson had no medical reason to touch Patient A's or Patient B's breasts, that Dr. Olson had other ways to verify their respective identities, and that he did not raise the issue during either patient's time-out process before surgery. Dr. Kennard testified that the only reason an anesthesiologist would have to touch Patient A's breasts would be while placing monitor or electrocardiogram patches and that the presence of implants would have no effect on the anesthesiologist's job. Dr. Kennard also testified about what an anesthesiologist's job was as far as identifying patients and the appropriate ways that an anesthesiologist can confirm a patient's identity without touching her. According to Dr. Kennard, hospitals never use physical characteristics to identify patients, so whether the patients had breast implants would not be helpful in verifying identities, and there was no medical reason for an anesthesiologist to touch a patient's breasts.

### 5. DR. KLOTH'S AND DR. AHUJA'S TESTIMONY

Dr. Kloth's and Dr. Ahuja's testimony that there is no medical reason for an anesthesiologist to touch a patient's breasts support challenged findings of fact 1.16, 1.24, and 1.26. These findings relate to Dr. Olson's lack of medical justification for touching Patient A's and Patient B's breasts.

### 6. DR. DROESCH'S TESTIMONY

Dr. Droesch's testimony supports challenged findings of fact 1.17, 1.24, and 1.25. These findings relate to Dr. Olson's failure to raise the issue of the patient's identities prior to their respective surgeries, that Patient B's breast implants did not affect Dr. Olson's ability to conduct his duties as an anesthesiologist and alternative ways that Dr. Olson could have verified the patients' respective identities. Dr. Droesch testified that Dr. Olson did not raise any questions of Patient A's or Patient B's identity during the time-out process or while they were getting ready for surgery. He also testified about the type of implants that Patient B had and that the implants were located under the pectoralis muscle, breast tissue, and skin.

### 7. DR. LORENZO'S AND DR. ORTOLANO'S DEPOSITION TESTIMONY

Dr. Lorenzo's and Dr. Ortolano's deposition testimony support challenged finding of fact 1.29 which relates to Dr. Olson's prolonged viewing of the vaginal surgeries on April 2. Both testified that Dr. Olson was the anesthesiologist for their surgeries on April 2, 2010, and that Dr. Olson came from the head of the operating bed where the anesthesia doctor is typically located to the foot of the bed during the surgery. Dr. Ortolano testified that Dr. Olson spent more time observing these surgeries than would be typical for an anesthesiologist to do. Dr. Ortolano remembered thinking that Dr. Olson's behavior was unusual and odd, while Dr. Lorenzo did not.

## COMMISSION'S CREDIBILITY DETERMINATIONS

First, Dr. Olson argues that the Commission erred as a matter of law by not entering proper findings as to all material facts and credibility determinations, alleging that the Commission's "complete lack of sufficient findings" makes the Commission's decision "indecipherable, unsupported, and insupportable." Br. of Appellant at 37. Dr. Olson then discusses the testimony from several witnesses which he alleges contradict Roy's testimony and argues that the Commission should have entered a credibility finding as to each witness. The Commission did not err because it entered sufficient findings on the credibility of the crucial witnesses.

Under the APA, the agency must enter findings of fact and conclusions of law on all the material issues of fact and law. *Yakima Police Patrolmen's Ass'n v. City of Yakima*, 153 Wn. App. 541, 562, 222 P.3d 1217 (2009). RCW 34.05.461(3) provides, in part,

> Initial and final orders shall include a statement of findings and conclusions, and the reasons and basis therefor, *on all the material issues of fact, law, or discretion presented on the record*, including the remedy or sanction and, if applicable, the action taken on a petition for a stay of effectiveness. Any findings based substantially on credibility of evidence or demeanor of witnesses shall be so identified. Findings set forth in language that is essentially a repetition or paraphrase of the relevant provision of law shall be accompanied by a concise and explicit statement of the underlying evidence of record to support the findings.

(Emphasis added.) The APA does not require that findings and conclusions contain an extensive analysis. *US West Commc'ns, Inc. v. Utils. & Transp. Comm'n*, 86 Wn. App. 719, 731, 937 P.2d 1326 (1997). "Adequacy, not eloquence, is the test." *US West*, 86 Wn. App. at 731. The absence of a finding of fact in favor of the party with the burden of proof as to a disputed issue is the equivalent of a finding against the party on that issue. *Yakima Police*, 153 Wn. App. at 562.

Here, the Commission's findings and conclusions were adequate. The Commission entered nearly 12 pages of findings of fact, several of which included credibility findings for witnesses Roy and Dr. Olson. Because the underlying dispute is whether Dr. Olson touched the patient's breasts as Roy alleged and Dr. Olson denied, and because no other witness testified to seeing what Roy saw, the remaining witnesses who testified were simply providing background material for the Commission to consider and did not present material issues of fact that the Commission needed to make specific findings on. Dr. Olson fails to cite any case law or further statute or rule requiring an agency to enter a finding of fact for every witness or every piece of evidence considered. Dr. Olson does not meet his burden of showing error.

PROCEDURAL DUE PROCESS

Next, Dr. Olson argues that the Commission's "charge first, ask questions second" policy deprived him of due process and a fair trial. Br. of Appellant at 41. We disagree and hold that Dr. Olson received due process from the filing of the complaint, through the investigation, and the Commission's review of the evidence against him.

"'Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.'" *Nguyen*, 144 Wn.2d at 522-23 (internal quotation marks omitted) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)). A medical license is a constitutionally protected property interest which must be afforded due process. *Nguyen*, 144 Wn.2d at 523. A process satisfies minimum constitutional requirements when it provides the citizen adequate safeguards in an action instigated against him by the state. *Nguyen*, 144 Wn.2d at 524. Courts generally apply the *Mathews* test to determine whether minimum constitutional due process is met in a variety of procedural situations.

*Nguyen*, 144 Wn.2d at 526 (citing *Mathews*, 424 U.S. at 335). Under the *Mathews* test, three factors are relevant: "(1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of such interest through the procedures used; and (3) the governmental interest in the added fiscal and administrative burden that additional process would entail." *Nguyen*, 144 Wn.2d at 526. Due process requires, at a minimum, notice and an opportunity to be heard. *Jolley v. Regence BlueShield*, 153 Wn. App. 434, 447, 220 P.3d 1264 (2009), *review denied*, 168 Wn.2d 1038 (2010).

Applying the *Mathews* test, we acknowledge that the Commission's action affected Dr. Olson's constitutionally protected property interest in his medical license. *Nguyen*, 144 Wn.2d at 523. Therefore, the Commission must apply a clear, cogent, and convincing evidence standard under *Nguyen*, 144 Wn.2d at 534. The Commission did so here.

Next, we examine the risk of erroneous deprivation. The risk of an erroneous deprivation of Dr. Olson's medical license is low under the procedures the Commission used here. In addition to several prehearing procedures, the Commission provided Dr. Olson a full administrative hearing. Administrative hearings provide a respondent with

> an unbiased tribunal, notice of the proposed action and the grounds asserted for it, an opportunity to present reasons why the proposed action should not be taken, the right to call witnesses, the right to know the evidence against [him or] her, the right to have a decision based only on the evidence presented, the right to counsel, the making of a record of the proceedings, public attendance of the proceedings, and judicial review of the proceedings.

*Hardee v. Dep't of Soc. & Health Servs.*, 172 Wn.2d 1, 11, 256 P.3d 339 (2011).

Here, the record supports the conclusion that Dr. Olson was afforded an adequate administrative hearing as described by *Hardee*. Dr. Olson received notice of the charges against him from the Commission in May 2010. On May 25, the Commission held a show cause hearing

to determine whether Dr. Olson posed an immediate threat to the public health, safety, or welfare. At the show cause hearing, the Commission considered declarations of several individuals, including declarations from Dr. Olson and his wife and Dr. Olson's legal memorandum. Then, in July, a full hearing was held in front of a HLJ and members of the Commission's panel. The HLJ heard testimony from Roy, another nurse, Detective Shepherd, Gruchalla, Kadlec management personnel, and other doctors including Dr. Kloth, Dr. Droesch, Dr. Olson, Dr. Ahuja, Dr. Kennard, and another expert witness. Dr. Olson testified, called several witnesses, and submitted over 20 exhibits. Dr. Olson fails to show that the procedures he received "suffer from inadequacies that make erroneous deprivations readily foreseeable." *Hardee*, 172 Wn.2d at 11. We hold that the procedures Dr. Olson received sufficiently protected him from erroneous deprivation of his medical license.

The third part of the *Mathews* test considers the governmental interest in the added fiscal and administrative burden that additional processes would entail. *Nguyen*, 144 Wn.2d at 526. "[T]his requirement relates to practical and financial burdens to be imposed upon the government were it to adopt a possible substitute procedure for the one currently employed." *Nguyen*, 144 Wn.2d at 532. Dr. Olson does not propose any possible substitute procedures.[7]

---

[7] Dr. Olson makes several allegations that the Commission's investigator rushed to judgment, that the Commission's allegations are based on "flimsy allegations," that he did not receive medical records from the investigator until a month before the hearing, and that there were discrepancies between the investigator's report and witnesses' statements. Br. of Appellant at 42. Dr. Olson then concludes that "[n]one of this is consistent with due process" and that we should "reverse and dismiss." Br. of Appellant at 42. Dr. Olson does not provide adequate citations to the record as is required by RAP 10.3(a)(6). The only record cites he provides are 1 AR 738-43 and 1 AR 748-50. 1 AR 738-42 are pages of Dr. Olson's June 2010 motion to dismiss the charges against him filed with the Commission. Dr. Olson's motion to dismiss is not evidence of any kind of due process violation. Similarly, 1 AR 748-50 are pages of a declaration in support of Dr. Olson's motion to dismiss from one of Dr. Olson's attorneys explaining some of his interactions with the Commission's investigator and identifying what Dr. Olson believed

Instead, Dr. Olson cites *State v. Stephans*, 47 Wn. App. 600, 603, 736 P.2d 302 (1987), *State v. Price*, 94 Wn.2d 810, 814, 620 P.2d 994 (1980), and *State v. Michielli*, 132 Wn.2d 229, 239-40, 937 P.2d 587 (1997), to support his assertion that his due process rights were violated. He alleges that the Commission engaged in misconduct and argues that under CrR 8.3(b), the misconduct requires us to dismiss the charges against him. But CrR 8.3(b) is clearly inapplicable here as it is a criminal court rule and this is an administrative action, not a superior court action for criminal charges. Similarly, *Stephans*, *Price*, and *Michielli* are criminal cases. Dr. Olson does not explain why criminal cases are applicable to his administrative action other than to say that a license revocation proceeding is quasi-criminal, citing *Nguyen*. We do not agree that these criminal cases apply to Dr. Olson's administrative action here. We hold that the Commission's procedures adequately protected Dr. Olson's due process interests.

UNPROFESSIONAL CONDUCT CONCLUSIONS

Last, Dr. Olson challenges conclusions of law 2.4 and 2.5 and argues that the Commission's unprofessional conduct conclusions misapply the law and are unsupported by factual findings. We disagree. The Commission properly applied the law because it was unnecessary for the Commission to find sexual motivation.

Conclusion of law 2.4 provides, "The [Commission] proved with clear and convincing evidence that [Dr. Olson] committed unprofessional conduct as defined in RCW 18.130.180(7) [and] WAC 246-919-630(2)." CP at 281. RCW 18.130.180(7) provides that it is unprofessional conduct to violate any state or federal statute or administrative rule regulating the profession in

---

to be misleading portions of the investigator's report. This declaration attempts to point out what he now argues are due process violations without citation to any relevant legal authority to support his argument. But Dr. Olson then wholly fails to cite any administrative cases or applicable legal authority to explain why we should determine that he was deprived of due process. Dr. Olson does not meet his burden and his argument fails.

question including rules establishing professional conduct. WAC 246-919-630(2) provides that "[a] physician shall not engage in sexual misconduct with a current patient or a key third party. A physician engages in sexual misconduct when he or she . . . (e) [t]ouch[es] breasts . . . for any purpose other than appropriate examination or treatment."

Applying the plain language of the RCW and WAC, conclusion of law 2.4 is properly supported by the Commission's findings of fact. Finding of fact 1.13 says that Dr. Olson touched Patient A's breasts and findings of fact 1.16 and 1.17 say that Dr. Olson had no appropriate examination or treatment purpose in doing so. Similarly, findings of fact 1.22 and 1.23 say that Dr. Olson touched Patient B's breasts and findings of fact 1.24 and 1.26 say that Dr. Olson had no appropriate examination or treatment purpose in doing so. As already discussed, these findings are supported by substantial evidence in the record and we rely on the Commission's experience and specialized knowledge to evaluate the evidence when finding unprofessional conduct. RCW 34.05.452(5); WAC 246-11-160(2); *Brown*, 94 Wn. App. at 13-14. Dr. Olson argues that the Commission erred because there was no evidence that he had sexual motivation in the touching. But the statutes and WACs do not require that the Commission find sexual motivation and Dr. Olson does not cite any further legal authority for this argument. RCW 18.130.180(7) and WAC 246-919-630(2) require that he not touch breasts for any reason other than for appropriate examination or treatment. The Commission's conclusion that Dr. Olson touched breasts with no appropriate examination or treatment reason is supported by the Commission's factual findings. The Commission did not err in conclusion of law 2.4.

Next, conclusion of law 2.5 provides, in pertinent part, "The [Commission] also proved with clear and convincing evidence that [Dr. Olson] committed unprofessional conduct as

defined in RCW 18.130.180(24)." CP at 281. RCW 18.130.180(24) provides that it is unprofessional conduct to engage in "[a]buse of a client or patient or sexual contact with a client or patient." The Commission panel can rely on its experience and specialized knowledge to evaluate the evidence when finding unprofessional conduct. RCW 34.05.452(5); WAC 246-11-160(2); *Brown*, 94 Wn. App. at 13-14.

Dr. Olson does not explain how the Commission erred in entering this conclusion. As explained regarding conclusion 2.4, the Commission's determination that Dr. Olson touched the breasts of two patients was supported by substantial evidence. Further, absent some ambiguity, we must give words in a statute their common meaning. *Heinmiller v. Dep't of Health*, 127 Wn.2d 595, 612, 903 P.2d 433, 909 P.2d 1294 (1995) (Pekelis, J. concurring), *cert. denied*, 518 U.S. 1006 (1996). The common meaning of sexual contact includes touching of breasts. And the circumstances found here, especially the duration and nature of Dr. Olson's touching and the absence of any legitimate medical reason to do so, support this conclusion. Dr. Olson's contention regarding this conclusion is that he did not engage in the touching, but substantial evidence supports that he did and, with no further argument, we have no reason to hold that the Commission erred in its conclusion of law 2.5.

CONCLUSIONS REGARDING THE IMPOSED SANCTION

Dr. Olson challenges conclusion of law 2.8(B) and argues that there was no evidence that he engaged in forceful contact under WAC 246-16-830, making the imposed sanction inappropriate. We disagree. The Commission's imposed sanction was appropriate under Tier B of the WACs and RCW 18.130.180(24).

Conclusion of law 2.8(B) provides,

> [Dr. Olson]'s unprofessional conduct under RCW 18.130.180(24) can be adequately addressed by the sanctions contained in Tier B of WAC 246-16-830. Tier B includes or addresses conduct by a licensee that is considered "forceful contact." [Dr. Olson] engaged in forceful contact with Patients A and B because of the physical state of the patients. Both Patients A and B were each under anesthesia (that is, unconscious) and therefore unable to give informed consent.

CP at 282-83. Tier B of WAC 246-16-830 applies to "[a]busive unnecessary or forceful contact or disruptive or demeaning behavior causing or risking moderate mental or physical harm, including general behavior not directed at a specific patient or patients." It also applies when the conduct is "[s]exual contact, romantic relationship, or sexual statements that risk or result in patient harm." WAC 246-16-820. Dr. Olson's argument regarding conclusion of law 2.8(B) is that the Commission did not show that he engaged in "severe . . . forceful contact." Br. of Appellant at 44. But under Tier B, the Commission did not have to find "severe" forceful contact. Severe forceful contact is included in the definition of Tier C conduct which provides for harsher punishment than Tier B conduct. WAC 246-16-830. The Commission found Tier B conduct, not Tier C. So any argument regarding "severe" contact is simply misplaced. And the Commission's conclusion that both patients were under anesthesia and unconscious at the time of the touching is supported by findings of fact 1.11 and 1.21 which are unchallenged findings and verities on appeal. *Hilltop Terrace*, 126 Wn.2d at 30. With no further argument from Dr. Olson, we have no reason to hold that the Commission erred in its conclusion of law 2.8(B).

No. 43552-7-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, A.C.J.

We concur:

BJORGEN, J.

MAXA, J.